**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DEVON CURTIS, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 21-cv-6079 |
| v. | ) ) | Hon. Steven C. Seeger |
| 7-ELEVEN, INC., | ) ) | |
| Defendant. | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

One summer day, Devon Curtis strolled into a 7-Eleven convenience store in Chicago, and did a little shopping. She bought four products from 7-Eleven's store brand, "24/7 Life." She picked up foam plates, foam cups, party cups, and freezer bags, perhaps en route to a picnic or a backyard BBQ.

Before getting her supplies and going on her way, Curtis took a close look at the products. She noticed that the packaging used the term "recyclable." That representation struck a chord with her. Curtis worries about her environmental footprint, and she wanted to avoid buying a product that would add another piece of garbage to a mountain of trash.

Later, Curtis placed the products in a recycling bin, thinking that they would enjoy new life as a new product someday. But according to the complaint, the recycling never took place. None of the products were actually recycled.

The problem, it turns out, wasn't the material used in the products. According to the complaint, the products are made out of plastics that *could* be recycled. But in reality, the products aren't recycled that often because few recycling facilities take that type of plastic.

Also, some of the products lacked markings – recycling designations known as RIC labels – and thus did not give recycling facilities the necessary information to sort the products.

Curtis later realized that she bought products that ended up in a landfill or an incinerator. Instead of going back to the store, and demanding a refund, Curtis went to the federal courthouse.

Curtis brings an assortment of claims on behalf of herself and a putative class of purchasers of the 24/7 Life products. She claims that 7-Eleven deceptively or unfairly places the term "recyclable" on the items despite their un-recyclability, in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. She also brings breach of warranty and unjust enrichment claims.

7-Eleven moved to dismiss for lack of standing, and for failure to state a claim. For the reasons explained below, the motion to dismiss is granted in part and denied in part.

## Background

7-Eleven operates a multinational chain of retail convenience stores. *See* Cplt., at ¶ 12 (Dckt. No. 23-1).[1] It operates, franchises, and licenses thousands of stores throughout the United States. *Id.* You can't drive very far in Chicagoland without driving by a 7-Eleven. Three of them are within a block of the courthouse.

7-Eleven manufactures, designs, and sells products with a store brand called "24/7 Life." *Id.* at ¶ 17. The 24/7 Life brand includes foam cups, foam plates, party cups, and freezer bags. *Id.* at ¶ 3. That brand appears on a "number of plastic products" in the store. *Id.* at ¶ 18.

---

[1] At first, the docket only had a scanned copy of the complaint. *See* Cplt. (Dckt. No. 1-1). But that scanned copy was of poor quality – instead of pictures, there were black blobs. So the Court asked Curtis to file a more legible copy. *See* 8/11/22 Order (Dckt. No. 22). Curtis did so, but the ECF copy is called "Notice" (with the better copy of the complaint as an attachment, so it is a bit camouflaged). *See* Cplt. (Dckt. No. 23-1). This Court will refer to the clearer copy of the complaint throughout the Opinion.

7-Eleven represents that its 24/7 Life brand is recyclable. *Id.* The company includes "various claims regarding their recyclability" on the packaging, meaning the boxes and bags. *Id.*

For example, the foam plates have the term "RECYCLABLE" directly on the front of the packaging, with the green recycling symbol (*i.e.*, the three green arrows, which point clockwise and bend and twist in a triangular direction). *Id.* at ¶ 21. The text isn't enormous, and it is less prominent than other text on the front of the packaging. But it is visible, and it appears right next to "25 PLATES." *Id.*

The complaint offers helpful pictures:

 

Other products have similar labeling. The foam cups and the red party cups have the same "RECYLABLE" term on their packaging, right next to the green recycling symbol. *Id.* at ¶¶ 28–29. The recycling symbol appears on the lids of the foam cups, and on the bottom of the red party cups, too.

3









The box of freezer bags refers to recycling, too. It says "MADE WITH RECYCLABLE

POLYETHYLENE," but the text is relatively small. *Id.* at ¶ 30. It is a fraction of the size of the

most prominent phrase: "FREEZER BAGS." *Id.* It is about the same size as the description of

the size of the bags ("10.56 IN x. 10.75 IN").





For each product, the packaging doesn't reach out and grab the reader with a bold

declaration that the product is recyclable. It is visible, to be sure. It isn't hard to spot. A

reasonable consumer could see it, if the consumer bothered to look at the packaging at all. (One

wonders how many people read the packaging of red party cups at 7-Eleven, when they probably

have other things on their mind.) But it is not the most prominent phrase on the packaging,

either. The key point is that Curtis claims that she read it, and that suffices for now.

In the summer of 2021, Devon Curtis entered a 7-Eleven in Chicago and purchased four 24/7 Life products: foam plates, foam cups, party cups, and freezer bags. *Id.* at ¶ 37. Curtis saw the term "recyclable" on the packaging of each product. *Id.* According to the complaint, she "reasonably understood that the products *would actually be recycled* if she placed them for recycling with her municipal recycling service." *Id.* at ¶ 38 (emphasis added).

Curtis later placed the products in a recycling bin. *Id.* at ¶¶ 39–40. But in the end, the products weren't recycled. Instead, the items suffered the same fate as any other piece of garbage. *Id.* They went into a trash heap. They ended up buried or burned, in a landfill or an incinerator. *Id.*

The complaint offers some background about the recycling industry to explain why the products were not recycled. To process plastic waste, a recycling facility must collect and separate products based on the type of plastic resin. *Id.* at ¶ 19. Manufacturers mark their products with certain Resin Identification Codes ("RICs") to assist recycling facilities. *Id.* It's a sort-by-number operation.

There are seven categories of recyclable plastics based on their resin types, with corresponding RIC numbers one through seven. *Id.* at ¶ 20. RIC numbers one through six identify six types of plastic resin, and RIC number seven is a catchall for all other categories of plastic. *Id.*

You have seen those designations before, even if you didn't know what they were, or what they were called. Put down the opinion for a second, take a quick walk, and grab any plastic product that happens to be nearby. A single-use plastic water bottle is a good example.

Turn it upside down, and you should be able to find the recycling symbol, meaning the three arrows that bend in a triangular shape. Look in the middle of the triangle, and you should

see a number. That's the RIC number. (On a personal note, by way of example, a tub of Kirkland cashews from Costco has an RIC number of 1.)

The complaint then walks through the details of each of the four products and explains why they aren't recyclable. Again, the problem is not the material in the products themselves. That is, the complaint does not allege that any of the products are made up of unrecyclable material.

The problem falls into two different categories. Sometimes the problem is the lack of recycling facilities. And sometimes the problem is the lack of RIC designations on the product itself. So, sometimes the problem is *outside* the product (*i.e.*, the lack of facilities), and sometimes the problem is *inside* the product (*i.e.*, that lack of markings on the products). There is an extrinsic problem, and an intrinsic problem.

***The Foam Plates.*** According to the complaint, the foam plates suffer from both problems. They lack an RIC number, and there is nowhere for them to go.

The complaint alleges that the foam plates "do not feature any RIC number on the front or the back." *Id.* at ¶ 22. The correct designation for styrofoam plastic is RIC No. 6, but no such label appears on the plates. *Id.* at ¶ 23. Without an RIC number, the plates "cannot be separated in the recycling process and actually be recycled." *Id.* at ¶ 22.

The lack of an RIC number is only part of the problem. No recycling facility in the area recycles that type of plastic. "[E]ven if the plates were properly labeled as RIC No. 6 – for styrofoam plastic – as with the vast majority of recycling facilities around the United States, there are no recycling facilities in the Chicago region that recycle RIC No. 6 plastics." *Id.* at ¶ 23.

The back of the packaging provides additional information about recycling. The bag encourages the reader to look into how to recycle the plates: "CHECK YOUR LOCAL MUNICIPALITY FOR RECYCLING GUIDELINES." *Id.* at ¶ 24.

As Curtis sees it, that disclosure made things worse, not better. The complaint alleges that the disclosure itself was misleading and deceptive. It "does not adequately disclose the limited availability of recycling programs that accept and recycle RIC No. 6 styrofoam plastic." *Id.*

So, as Curtis sees it, the problem with the plates is twofold. The plates lack an RIC number that is necessary to sort the plastic. And even if the plates had that number, there isn't a recycling facility in the area that could do the recycling. *Id.* at ¶ 23.

*The Foam Cups.* Unlike the foam plates, the foam cups do have an RIC number (RIC No. 6). The complaint includes a picture, which shows the designation *Id.* at ¶ 28. Instead, the problem is the lack of recycling plants. The complaint alleges that RIC No. 6 styrofoam plastic "is not actually recycled by any municipal recycling facilities." *Id.*

*The Party Cups.* The party cups have a similar problem. They are made of RIC No. 5 plastic, and "less than 5% of all RIC No. 5 plastic collected nationwide is actually recycled." *Id.* at ¶ 29. So, "even if collected," the party cups "will either be stockpiled, incinerated, or sent to a landfill." *Id.*

*The Freezer Bags.* Finally, the box of freezer bags says that they are "made with recyclable polyethylene." *Id.* at ¶ 30. But polyethylene plastics fall under three different RIC numbers. *Id.* at ¶ 31. And here, the freezer bags lack any RIC number. *Id.* at ¶¶ 30–32. Without an RIC number, "there is no way for the Freezer Bags to be separated during the sorting process and they cannot be recycled." *Id.* at ¶ 32.

8

Curtis alleges that 7-Eleven's practice of labeling products as recyclable constitutes deceptive and unfair "greenwashing." *Id.* at ¶ 25. That is, 7-Eleven puts "recyclable" on its products to persuade consumers that the company is environmentally friendly. But in the end, the products wind up in landfills or an incinerator. *Id.* Despite their labeling, 7-Eleven's 24/7 Life products are not actually recycled. The products – like the rest of us – end their days in the ground or up in flames.

Curtis points to the Federal Trade Commission's Guides for the Use of Environmental Marketing Claims ("Green Guides"). *Id.* at ¶ 26; *see also* 16 C.F.R. § 260.1 *et seq.* According to the Green Guides, "[a] product or package should not be marketed as recyclable unless it can be collected, separated, or otherwise recovered from the waste stream through an established recycling program for reuse or use in manufacturing or assembling another item." *See* 16 C.F.R. § 260.12(a). Curtis claims that 7-Eleven violated these guidelines by selling 24/7 Life plastic products and labeling them as recyclable when, in reality, they won't be recycled. *See* Cplt., at ¶¶ 54–56 (Dckt. No. 23-1).

Curtis brings three claims. Count I is a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"). *Id.* at ¶¶ 49–59. Count II alleges breach of express warranty. *Id.* at ¶¶ 60–64. And Count III is an unjust enrichment claim. *Id.* at ¶¶ 65–68.

7-Eleven removed the case to federal court. *See* Notice of Removal (Dckt. No. 1). 7-Eleven then filed a motion to dismiss the complaint. *See* Def.'s Mtn. to Dismiss (Dckt. No. 12).

**Legal Standards**

7-Eleven moved to dismiss the complaint for lack of standing, and for failure to state a claim. *See* Def.'s Mtn. to Dismiss (Dckt. No. 12). Different standards apply to each type of challenge.

Article III standing is an "essential component of Article III's case-or-controversy requirement," and therefore a "threshold jurisdictional question." *Apex Dig., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997).

A party can bring either a facial challenge or a factual challenge to a plaintiff's standing. *See Apex Dig.*, 572 F.3d at 443. A facial challenge means that the complaint does not sufficiently allege that the plaintiff has standing. *Id.* A facial challenge operates like an ordinary motion to dismiss. A court must "accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in plaintiff's favor," and cannot rely on evidence outside the pleadings. *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 691 (7th Cir. 2015) (citation omitted).

In contrast, a factual challenge involves an argument about real-world facts, not the allegations of the complaint. The complaint may be "formally sufficient," but "there is *in fact* no subject matter jurisdiction." *See Apex Dig.*, 572 F.3d at 444 (citing *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003)) (emphasis in original). In a factual

challenge, a court may consider "whatever evidence has been submitted" on the issue of standing. *Id.*

7-Eleven brings a facial challenge to standing, even though it doesn't use that terminology. 7-Eleven contends that Curtis "does not allege any factual basis" to support standing. *See* Def.'s Mem. in Supp. of its Mtn. to Dismiss ("Def.'s Mem."), at 10 (Dckt. No. 13). The question, then, is whether the complaint alleges sufficient facts to give rise to standing.

A motion to dismiss for failure to state a claim challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Curtis pleads deceptive conduct under the Illinois Consumer Fraud and Deceptive Business Practices Act, so she faces the heightened pleading standard of Rule 9(b). *See Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) ("If the claim rests on allegations of deceptive conduct, then [Federal Rule of Civil Procedure] 9(b) applies and the plaintiff must plead with particularity the circumstances constituting fraud.") (addressing the ICFA) (brackets in original). That standard requires that she "state with particularity the circumstances constituting fraud or mistake." *See* Fed. R. Civ. P. 9(b).

Curtis must describe the "who, what, when, where, and how" of 7-Eleven's deception. *See AnchorBank*, 649 F.3d at 615 (citation omitted); *see also Benson*, 944 F.3d at 646. The complaint needs to paint "a sufficiently detailed picture of the alleged scheme." *See AnchorBank*, 649 F.3d at 615. But the heighted pleading standard does not apply to 7-Eleven's intent or knowledge. *See* Fed. R. Civ. P. 9(b).

## Analysis

7-Eleven challenges the complaint on two grounds. The company argues that Curtis lacks standing to bring claims on her own behalf, or on behalf of a class. 7-Eleven also argues that the complaint fails to state a claim.

Subject matter jurisdiction, as always, comes first.

## I.      Standing

Article III vests federal courts with the power to decide "Cases" and "Controversies." *See* U.S. Const. art. III, § 2. The doctrine of standing flows from that bedrock requirement. Standing is a "short-hand term for the right to seek judicial relief for an alleged injury." *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017).

Courts use a three-prong test to determine whether a party has standing to bring a claim. *See Lujan*, 504 U.S. at 560. A plaintiff must show that she: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1151 (7th Cir. 2020) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)); *Ewing v. MED-1 Sols., LLC*, 24 F.4th 1146, 1151 (7th Cir. 2022).

An injury in fact is the "foremost" standing requirement. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998). The injury must be "concrete, particularized, and actual or imminent." *See Ewing*, 24 F.4th at 1151.

"A concrete injury is essential to standing: 'No concrete harm, no standing.'" *Id.* (citing *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021)). A particularized injury "affects the plaintiff in a personal and individual way." *Crabtree v. Experian Info. Sols., Inc.*, 948 F.3d 872, 877 (7th Cir. 2020) (citation omitted). A plaintiff needs an injury to stand on.

Curtis, as the party invoking federal jurisdiction, has the burden to demonstrate standing. *See Spokeo*, 578 U.S. at 338. A plaintiff must "clearly . . . allege facts demonstrating" each of the elements. *Warth v. Seldin*, 422 U.S. 490, 518 (1975). And a plaintiff must show that she has standing for all her claims. *See Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017) ("[S]tanding is not dispensed in gross. To the contrary, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.") (cleaned up).

Here, Curtis seeks three kinds of relief: (1) damages on behalf of herself, (2) damages on behalf of a class, and (3) an injunction. 7-Eleven challenges her standing to seek each type of relief.

### A.    Standing on Her Own

The first issue is Curtis's standing to sue in her own right. Curtis brings a putative class action, but she can't represent the class if she suffered no injury. *See Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 676 (7th Cir. 2009) ("Before a class is certified, . . . the named plaintiff must have standing, because at that stage no one else has a legally protected interest in maintaining the suit."); *Castillo v. Unilever U.S., Inc.*, 2022 WL 704809, at *2 (N.D. Ill. 2022) ("Jurisdiction

over a putative class action depends on the named plaintiffs' standing."); *Vega v. Mid Am. Taping & Reeling, Inc.*, 2018 WL 2933676, at *2 (N.D. Ill. 2018) ("[A] named plaintiff's Article III standing is an issue antecedent to the class-certification analysis.") (cleaned up). She can't stand up for anyone else if she has no standing.

The complaint squarely alleges that Curtis suffered an economic injury. Curtis alleges that she would not have purchased the 24/7 Life products if she had known that they were not recyclable. *See* Cplt., at ¶¶ 35, 40 (Dckt. No. 23-1). Or, at the very least, she would have been willing to pay less for them. *Id.*

Buying a product based on false pretenses gives rise to standing because it involves an economic injury. The deception hit Curtis in the pocketbook, because she made an economic decision based on misinformation. An act that lightens the pocketbook gives rise to standing, because a loss of money is an injury. *See, e.g.*, *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 968 (7th Cir. 2016) (noting that courts have recognized an injury "where the product itself was defective or dangerous and consumers claim they would not have bought it (or paid a premium for it) had they known of the defect"); *In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748, 751 (7th Cir. 2011) ("The plaintiffs' loss is financial: they paid more for the toys than they would have, had they known of the risks the beads posed to children. A financial injury creates standing."); *Remijas*, 794 F.3d at 695 ("[W]e have held that financial injury in the form of an overcharge can support Article III standing.") (citing *Aqua Dots*, 654 F.3d at 751); *see also Castillo*, 2022 WL 704809, at *3; *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, 159 F. Supp. 3d 898, 909 (N.D. Ill. 2016); *Muir v. Playtex Prods., LLC*, 983 F. Supp. 2d 980, 986 (N.D. Ill. 2013).

Courts in other districts hold that similar allegations of falsely labeled "recyclable" products suffice for Article III standing. *See, e.g.*, *Downing v. Keurig Green Mountain, Inc.*, 2021 WL 2403811, at *3 (D. Mass. 2021) (holding that the plaintiff had standing because he alleged that "[h]ad Keurig not claimed that its products were recyclable when they were allegedly not entitled to do so, [the plaintiff] would not have purchased the pods believing that they were recyclable"); *Smith v. Keurig Green Mountain, Inc.*, 393 F. Supp. 3d 837, 844 (N.D. Cal. 2019) (holding that the plaintiff sufficiently alleged an injury in fact where the complaint "alleges that if [the plaintiff] knew the Pods were not recyclable, she would have sought 'other coffee products that are otherwise compostable, recyclable or reusable'") (citation omitted).

Curtis has sufficiently alleged an injury-in-fact for Article III standing. 7-Eleven does not challenge the two remaining prongs of standing (causation and redressability). The complaint satisfies those requirements, too. Curtis alleges that 7-Eleven's mislabeling caused her financial injury, and that monetary relief would make her whole.

### B. Standing as the Class Representative

The next question involves her standing to represent a class that includes purchasers of other products. The issue is whether Curtis has standing to represent consumers who bought products that she herself did not buy.

Curtis seeks to represent a class of all purchasers of 24/7 Life plastic products. She proposes a class that includes all people in the United States who "purchased any of Defendant's 24/7 Life plastic products that were labeled as recyclable and: (1) did not feature an RIC number on the product itself, and/or (2) was made from RIC No. 5 plastic, and/or (3) was made from RIC No. 6 plastic." *Id.* at ¶ 41.

That class definition is broader than the allegations about Curtis's own purchases. She did not go on a wild shopping spree, cleaning out the store and buying anything and everything in her path. Instead, she bought four specific products within 7-Eleven's 24/7 Life brand: (1) foam cups, (2) foam plates, (3) party cups, and (4) freezer bags.

The 24/7 Life product line includes other plastic products, too, but Curtis didn't buy them. *See* Cplt., at ¶ 17 (Dckt. No. 23-1). So the proposed class necessarily includes products that she did not personally buy.

7-Eleven argues that Curtis lacks standing to represent "classes of individuals that purchased countless other 7-Eleven products." *See* Def.'s Mem., at 12 (Dckt. No. 13). According to 7-Eleven, Curtis's standing as the class representative is limited to people who bought the four exact same products within the 24/7 Life brand.

Courts in this district are split on whether a named plaintiff has standing to represent a putative class who bought different products. "Several courts have concluded that a named plaintiff cannot maintain claims either for herself or on behalf of a class for products that she did not purchase. But other courts have concluded that a named plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar." *See Flaherty v. Clinique Labs. LLC*, 2021 WL 5299773, at *4 (N.D. Ill. 2021) (cleaned up) (collecting cases).

Multiple courts have observed that the latter approach – allowing a plaintiff to sue on behalf of class members with substantially similar injuries from similar products – is the "majority" rule. *See, e.g.*, *Geske v. PNY Techs., Inc.*, 503 F. Supp. 3d 687, 700 (N.D. Ill. 2020); *Ulrich v. Probalance, Inc.*, 2017 WL 3581183, at *6 (N.D. Ill. 2017); *Wagner v. Gen. Nutrition*

16

*Corp.*, 2017 WL 3070772, at *5 (N.D. Ill. 2017); *Mednick v. Precor, Inc.*, 2014 WL 6574915, at *3 (N.D. Ill. 2014).

The majority rule here is the majority rule elsewhere.  Courts around the country have recognized a named plaintiff's standing to represent a putative class of purchasers who bought substantially similar products.  *See, e.g., In re S.C. Johnson & Son, Inc. Windex Non-Toxic Litigation*, 2021 WL 3191733, at *2–3 (N.D. Cal. 2021); *Browning v. Anheuser-Busch, LLC*, 2021 WL 1940645, at *8 (W.D. Mo. 2021); *Richey v. Axon Enterprises, Inc.*, 437 F. Supp. 3d 835, 843 (D. Nev. 2020); *Zemola v. Carrington Tea Co., LLC*, 2017 WL 4922974, at *4 (S.D. Cal. 2017); *Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 541–42 (S.D.N.Y. 2013).  A helpful treatise summarized this majority approach:

> Courts have disagreed on whether a named consumer plaintiff has standing to sue on behalf of purchasers of a product that he or she did not purchase based on a theory that the non-purchased products are essentially the same as the purchased product.  A substantial number of courts have decided that a plaintiff may have standing to assert claims on behalf of class members based on products he or she did not purchase as long as the products and alleged misrepresentations about a purchased product are substantially similar.  In those cases, the substantial similarity determination is a context-specific analysis, but frequently entails reference to whether the challenged products are of the same kind, whether they are composed of largely the same ingredients, and whether each of the challenged products bears the same alleged mislabeling.

*See* 1 McLaughlin on Class Actions § 4:28 (18th ed. 2021) (citations omitted).

"At the motion to dismiss stage, the court's review of the scope of a named plaintiff's Article III standing is limited to evaluating whether the complaint contains factual allegations that raise a reasonable inference that the products are substantially similar."  *Id.*

This Court joins that majority approach. If the named plaintiff has standing, and if the putative class members would have standing in their own right, then there does not appear to be any Article III problem with the named plaintiff representing the class. If everyone suffered an injury, everyone would have standing. (Put aside the other standing requirements.)

There might be a typicality problem, or a commonality problem, or an adequacy of representation problem under Rule 23 if the products are different in a meaningful way. A named plaintiff cannot represent people who sit in a different seat. Rule 23 requires the named plaintiff and the class members to be similarity situated, so meaningful differences can raise eyebrows at the class certification stage.

An Article III issue might arise if the class definition included people who did not have standing to sue. Imagine if the class definition included people who bought products that did not have the "recyclable" label. Or, imagine if the class definition included people who never saw the "recyclable" label, or who don't care about recycling one way or the other. Some people are more concerned about recycling than others (as you can tell by driving down your street). A landfill executive, for example, might not be so concerned where his red party cups wind up.

In that situation, the class could raise potential standing issues. Every plaintiff needs standing, and a named plaintiff can't represent people who don't have standing to sue in their own right. Only people who have Article III standing can get relief from an Article III court.

Still, 7-Eleven makes no such argument here. The issue is simply whether a named plaintiff has standing to sue on behalf of putative class members who bought substantially similar products.

Most courts answer that question in the affirmative, and this Court joins the fold. Curtis has standing to sue on behalf of others who suffered a substantially similar injury after buying

similar 24/7 Life plastic products at 7-Eleven based on similar misrepresentations. *See Geske*, 503 F. Supp. 3d at 700.

That said, the Court acknowledges that line drawing can be tricky. Suppose, for example, Curtis had purchased a package of 12-ounce foam cups. Could she represent a purchaser of 16-ounce foam cups, too? Surely the answer is yes – presumably the volume of the liquid would make no difference. Could she represent a purchaser of different types of plastic cups (like the transparent kind, in hard plastic)? What about a purchaser of foam bowls? Plastic silverware? All plastic products? Can she represent all purchasers of 24/7 Life food products with the same labeling? How similar is similar enough, for purposes of standing?

Pinning down the scope of that putative class can come later. For now, it is sufficient to conclude that, for Article III purposes, Curtis has standing to sue on behalf of buyers of substantially similar products, even if they purchased different 24/7 Life plastic products from 7-Eleven. If the putative class is overbroad, this Court can perform trimming down the road.

### C.    Injunctive Relief

Finally, 7-Eleven argues that Curtis lacks standing to seek injunctive relief. *See* Def.'s Mem., at 13 (Dckt. No. 13). 7-Eleven contends that Curtis does not face a risk of future harm and, therefore, has no standing to seek an injunction. She has no standing to seek judicial protection that she doesn't need. The Court agrees.

Again, a plaintiff bears the burden of demonstrating standing to seek each form of relief. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought."). Standing to seek damages does not automatically give rise to standing to seek an injunction. A plaintiff must independently establish standing for injunctive relief. *See Kenseth v. Dean Health Plan*,

722 F.3d 869, 890 (7th Cir. 2013) ("[A] plaintiff must demonstrate standing for each form of relief sought. A plaintiff may have standing to pursue damages but not injunctive relief, for example, depending on the circumstances.").

Standing for injunctive relief depends on the probability of future harm. *See Muir v. NBTY, Inc.*, 2016 WL 5234596, at *10 (N.D. Ill. 2016). The question is the likelihood that the plaintiff will suffer an injury in the future, not whether the plaintiff has experienced harm in the past. *See Simic*, 851 F.3d at 738 ("Unlike with damages, a past injury alone is insufficient to establish standing for purposes of prospective injunctive relief . . . ."); *see also TransUnion*, 141 S. Ct. at 2210 ("[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial."). Damages often look back, but an injunction looks forward.

The threat of future injury must be imminent, not conjectural. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (holding that a plaintiff must show a "sufficient likelihood that he will again be wronged in a similar way"). A plaintiff who seeks an injunction must face a "real and immediate threat of future injury." *See Carello v. Aurora Policemen Credit Union*, 930 F.3d 830, 833 (7th Cir. 2019).

The past is not always prologue when it comes to injuries and injunctive relief. A past injury does not imply a likely future injury. That's especially true when it comes to getting duped. People who get fooled once aren't likely to get hoodwinked the same way again. That presumption is so strong that there is a modicum of scorn on anyone who gets snookered twice: "fool me once, shame on you; fool me twice, shame on me."

The complaint does not allege any facts suggesting that there is a risk of future harm. The pleading contains no allegations about the possibility of buying the products again. In fact, it says that she would not have bought the plates at all, or would have paid less for them, if she had known the truth about the products. The latter possibility isn't much of an option – 7-Eleven isn't known as a great place for haggling.

It is hard to see how she could be hoodwinked again by the "recyclable" label, even if she bought the products again. Curtis alleges that she now knows the truth about the products. From her standpoint, the jig is up. She is unlikely to be fooled twice. *See Rice v. Dreyer's Grand Ice Cream, Inc.*, 2022 WL 3908665, at *2 (N.D. Ill. 2022) ("Because Rice is aware of the presence of vegetable oil in the product, he faces no risk of future harm from being deceived by the failure of the product's front label to mention vegetable oil, and he therefore lacks standing to seek prospective injunctive relief."); *Castillo*, 2022 WL 704809, at *4 ("Because Plaintiffs are aware of the presence and potential effects of DMDM hydantoin in TRESemmé shampoos and conditioners, they face no future risks from those products."); *Geske*, 503 F. Supp. 3d at 702 ("Once a plaintiff knows that a product is deficient, he or she is unlikely to purchase it again, and therefore unlikely to sustain future harm."); *Camasta*, 761 F.3d at 741 ("Since Camasta is now aware of JAB's sales practices, he is not likely to be harmed by the practices in the future. Without more than the speculative claim that he will be harmed by JAB, Camasta is not entitled to injunctive relief.").

There is no apparent need for an injunction, because there is no reason to think that there is any likelihood that Curtis will suffer the same harm again. The complaint does not allege that Curtis plans to purchase the products again, and even if she did, she wouldn't be fooled. Without a risk of future injury, there is no basis for an injunction protecting her from injury.

An allegation that 7-Eleven continues to sell the products is not enough to establish standing for an injunction.  A complaint needs to allege a factual basis giving rise to a plausible inference that the plaintiff will suffer a future injury.  *See Benson v. Newell Brands, Inc.*, 2020 WL 1863296, at *3 (N.D. Ill. 2020) ("If plaintiffs are aware of defendants' allegedly deceptive practices in marketing the NUK pacifiers, there is no 'real and immediate' threat that this marketing will injure them again.  Plaintiffs therefore cannot pursue injunctive relief."); *Benson v. Fannie May Confections Brands, Inc.*, 2018 WL 1087639, at *5 (N.D. Ill. 2018) ("Most courts to address similar circumstances have held that absent some concrete basis to conclude that the plaintiffs will or must purchase the product again in the future and be deceived, they cannot meet the standing requirements for injunctive relief claims.").

The possibility that some class members might not know about the mislabeling cannot give Curtis standing to obtain injunctive relief, either.  A named plaintiff who lacks standing for injunctive relief cannot seek an injunction on behalf of a class, even if the class does not yet know that it was duped.  Curtis cannot rely upon a class to obtain injunctive relief that she herself does not need.  *See Spokeo*, 578 U.S. at 338 n.6 ("That a suit may be a class action adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.") (cleaned up); *Rice*, 2022 WL 3908665, at *2 ("That absent putative class members might be unaware of the presence of vegetable oil in the product, and thus deceived by its front label, does not warrant a different conclusion."); *Castillo*, 2022 WL 704809, at *4 ("Because Plaintiffs fail to plausibly allege a risk of an imminent injury to themselves, they lack standing to seek injunctive relief for either

22

themselves or unnamed class members.").  A named plaintiff has no standing to seek a remedy on behalf of others that she has no standing to seek on behalf of herself.

Even if there is a knowledge disparity now (about the recyclability of the products), it won't last forever.  Rule 23 rests on the notion that class members will have notice of the claim brought by the named plaintiff.  The putative class members may not know now about any issues with the recyclability of the 7-Eleven products.  But they will know before this Court gets to the point of thinking about an injunction.  That's the point of notice to the class.  If they know about past injury then, there is little reason to think that they will need protection from future injury.

So, for now, the Court dismisses the demand for injunction relief, because the complaint gives no indication that there is any likelihood of future injury.  That said, the case is at the pleading stage, so the Court could revisit the issue down the road if the facts justify it.

## II.     Illinois Consumer Fraud and Deceptive Business Practices Act (Count I)

Standing is one thing.  Stating a claim is another.

Curtis's first claim alleges a violation of the Illinois Consumer Fraud Act.  *See* 815 ILCS 505/2; Pl.'s Resp., at 14 (Dckt. No. 17) (confirming that Plaintiff is invoking only Illinois law, not consumer-protection statutes from other states).  The Act is "a regulatory and remedial statute intended to protect consumers . . . against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 266 Ill. Dec. 879, 775 N.E.2d 951, 960 (2002).  Deceptive or unfair practices include any "misrepresentation or the concealment, suppression or omission of any material fact." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019) (quoting 815 ILCS 505/2).

The Act covers both deceptive practices and unfair conduct.  *See Benson*, 944 F.3d at 646.  A practice is deceptive if it "creates a likelihood of deception or has the capacity to deceive

23

a reasonable consumer." *Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 322 (7th Cir. 2021) (cleaned up). Unfair conduct "offends public policy; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury to consumers." *Id.* (cleaned up). Only the first theory is in play here, because Curtis alleges that the conduct was deceptive (but not unfair).

"A deceptive-practice claim under the ICFA has five elements: (1) the defendant undertook a deceptive act or practice; (2) the defendant intended that the plaintiff rely on the deception; (3) the deception occurred in the course of trade and commerce; (4) actual damage to the plaintiff occurred; and (5) the damage complained of was proximately caused by the deception." *Newman v. Met. Life Ins. Co.*, 885 F.3d 992, 1001 (7th Cir. 2018); *Mashallah*, 20 F.4th at 322 (citing *Benson*, 944 F.3d at 646); *Vanzant*, 934 F.3d at 736; *Blanton v. RoundPoint Mortg. Servicing Corp.*, 825 F. App'x 369, 373 (7th Cir. 2020); *Cmty. Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 822 (7th Cir. 2018) ("A plaintiff bringing a private claim under the ICFA must show five elements."); *see also Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 267 Ill. Dec. 14, 776 N.E.2d 151, 160 (2002).

7-Eleven challenges two of the five elements. 7-Eleven argues that the "recyclable" labeling was not deceptive, and that Curtis failed to plead actual damages. The Court will go one step at a time.

### A. Deceptive Act or Practice

The first question is whether the complaint alleges a deceptive act or practice within the meaning of the statute.

Again, a "practice is deceptive 'if it creates a likelihood of deception or has the capacity to deceive.'" *Benson*, 944 F.3d at 646 (quoting *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001)). "A label is deceptive if it is likely to mislead a reasonable consumer in a

24

material respect, even if it is not literally false." *Beardsall v. CVS Pharm., Inc.*, 953 F.3d 969, 973 (7th Cir. 2020).

To determine the likelihood of deception, courts apply a "reasonable consumer" standard. *Id.* "This requires more than a mere possibility that [a] label might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner. Rather, the reasonable consumer standard requires a probability that a significant portion of the general consuming public . . . acting reasonably in the circumstances, could be misled." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016); *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020) (citing *Ebner*).

Context matters, too. "[W]hen analyzing a claim under the ICFA, the allegedly deceptive act must be looked upon in light of the totality of the information made available to the plaintiff." *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 884 (7th Cir. 2005); *see also Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 477 (7th Cir. 2020) ("We stand by the general principle that deceptive advertising claims should take into account all the information available to consumers and the context in which that information is provided and used.") (citing *Davis*, 396 F.3d at 884).

Here, the crux of the claim is the representation that the products are "recyclable." The plain meaning of that term is straightforward. "Recyclable" simply means "capable of being recycled." *See recyclable*, American Heritage Dictionary of the English Language (5th ed. 2018); *see also id.* ("An item or material that can be recycled."); *recyclable*, New Oxford Dictionary (3d ed. 2010) ("able to be recycled"); *recyclable*, Oxford English Dictionary (3d ed. 2009) ("capable of being recycled").

That understanding meshes with common parlance for similar terms. When a word ends with the suffix "able," it conveys an ability – it means that someone or something is able to do

something. *See How -Able Lets You Expand Your Descriptive Abilities*, Dictionary.com, https://www.dictionary.com/e/when-do-you-add-able-to-a-word/ (last visited Sept. 13, 2022) ("Adding *-able* to a word makes it into an adjective that indicates something or someone is *capable of* or *worthy of* something.") (emphasis in original); *-Able and -Ible*, *grammarist.com*, https://grammarist.com/usage/able-ible/ (last visited Sept. 13, 2022) ("The suffixes *-able* and *-ible* both mean *capable of* or *suitable for . . . .*") (emphasis in original); *Commonly Confused Suffixes: -Able vs. -Ible*, thefreedictionary.com, https://www.thefreedictionary.com/Commonly-Confused-Suffixes-able-vs-ible.htm (last visited Sept. 13, 2022) ("The suffixes '-able' and '-ible' are both used to form adjectives meaning 'possible, capable of, suitable for, or causing.'"); *-able*, MacmillanDictionary.com (last visited Sept. 13, 2022) ("-able.  Used with many verbs to make adjectives describing something that can be done."); *able*, Merriam-Webster.com (last visited Sept. 13, 2022) ("-able.  Adjective suffix.  Capable of, fit for, or worthy of.").   It communicates that something is within the realm of possibility.  It means that something can happen.

Examples from common usage quickly come to mind.  "Drinkable" means you can drink it.  "Edible" means you can eat it.  "Drivable" means you can drive it.  "Fixable" means you can fix it.  "Movable" means you can move it.  "Washable" means you can wash it.  "Readable" means you can read it.  "Reversible" means, if you must, you can reverse it.  "Recyclable" means you can recycle it.

"Recyclable" simply means that the product is capable of being recycled.  It is about product itself, meaning its intrinsic character.  It is not about what happens to the product after it goes into the recycling bin.  It is not about the next stage of the recycling process, or the proximity of recycling facilities in the local area, or the economics of the recycling industry.  "Recyclable" is a description of a quality that is intrinsic, not extrinsic, to the product.

The natural meaning of "recyclable" places outer limits on any claim of deception. To bring a claim, a plaintiff would have to allege that the products say that they *are* recyclable when they *aren't* recyclable. That is, a plaintiff would have to allege that the seller claims that the products *can* be recycled when, in reality, they *can't* be recycled.

And that's where the complaint runs into trouble, at least in part. The complaint offers two theories about why the products are not recyclable. One theory is about the availability of recycling facilities, and the other is about the lack of markings on the products themselves. The second theory states a claim, but the first theory does not.

### 1.      The Availability of Recycling Facilities

Plaintiff's first theory is that the products are not recyclable because the products are *unlikely* to be recycled, because recycling facilities are few and far between. That's not a claim. 7-Eleven never represented anything about the likelihood of recycling.

The first sentence of the complaint declares that 7-Eleven represented that the plastic products "are recyclable where in fact they are not." *See* Cplt. (Dckt. No. 23-1). But before long, the complaint starts walking it back.

The hedging starts early in the complaint. In paragraph four, Curtis alleges that the products "are not recyclable because they are made out of plastics that are not recyclable in any municipal recycling facilities *that consumers have access to*." *Id.* at ¶ 4 (emphasis added).

Later paragraphs describe the products, and offer more hedging. Consider the allegations about the foam plates and the foam cups. They are made from RIC No. 6 plastic, and the "vast majority" of recycling facilities in the United States do not process that type of plastic. *Id.* at ¶ 23. There are "no recycling facilities in the Chicago region that recycle RIC No. 6 plastics."

27

*Id.*; *see also id.* at ¶ 28 (alleging that "RIC No. 6 styrofoam plastic . . . is not actually recycled by any municipal recycling facilities").

So, under that theory, the core problem is not the product itself. The problem is that there is nowhere for the product to go. No facility near Chicago recycles that type of plastic. As Curtis sees it, the packaging is deceptive because "it does not adequately disclose the limited availability of recycling programs that accept and recycle RIC No. 6 styrofoam plastic." *Id.* at ¶ 24.

The limited availability of recycling facilities does not mean that the plates and cups are not recyclable. The term "recyclable" is about the inherent qualities of the product. It is about what *can happen*. It is not a promise about the state of the recycling industry. It is not a prediction of what is likely to happen after a product hits the recycling bin.

The limited number of recycling facilities does not render 7-Eleven's statement deceptive or misleading. A reasonable consumer would not read into the word "recyclable" a guarantee that there are local facilities that recycle that type of plastic. "Recyclable" does not mean "Will Be Recycled at a Facility Near *YOU*!"

If anything, the complaint confirms that the products *are* recyclable. Recycling facilities are capable of recycling plates made of RIC No. 6 plastics. But there aren't any facilities nearby. That's unfortunate, but that's not deception by 7-Eleven. Maybe recycling capacity is "limited," but 7-Eleven never said that recycling programs were abundant. *Id.* at ¶ 24.

The red party cups use a different plastic (RIC No. 5), but they share the same problem. The packaging for the red party cups says that the products are recyclable, but in reality, "they are made from RIC No. 5 plastic." *Id.* at ¶ 29. The recycling market for that type of plastic

28

apparently has fallen on hard times. "[T]here is currently no market for RIC No. 5 plastics and less than 5% of all RIC No. 5 plastic collected nationwide is actually recycled." *Id.*

Take a close look at that sentence. RIC No. 5 plastic can, in fact, be recycled. It's recyclable! It just doesn't happen very often, or in very many places. And notice the hedge in the use of the adverb "currently." There "currently" is no market for recycling that product. It can be done. It just doesn't make economic sense to do it, apparently.

"Recyclable" does not mean "It Makes Economic Sense to Recycle This Product from a Business Perspective."

"Recyclable" does not mean "destined for inevitable recycling." And it does not mean "likely to be recycled." "Recyclable" simply means that it can be recycled. And here, the complaint acknowledges that the products are made of two types of plastic that can, in fact, be recycled.

Curtis might have a claim if 7-Eleven made a representation about the likelihood that the products would be recycled, or about the ease of recycling the products, or about the prevalence of nearby recycling facilities. But here, 7-Eleven did no such thing. 7-Eleven simply alleged that the products are capable of getting recycled. And as it turns out, that's true – according to the complaint itself.

Perhaps the crux of the complaint appears in paragraph 38. Curtis alleges that she saw the "recyclable" packaging, and "reasonably understood that the products *would actually be recycled* if she placed them for recycling with her municipal recycling service." *Id.* at ¶ 38 (emphasis added).

7-Eleven represented no such thing. "Recyclable" means "can be recycled." It does not mean "will be recycled." It does not mean "probably will be recycled." It does not mean "easy

to recycle." It does not mean "destined for a new life through recycling at a nearby, economically prosperous facility near the place of purchase."

Imagine buying a recyclable water bottle out of a vending machine in Chicago. And imagine that Chicago is an eco-friendly, earth-loving locale with an abundance of recycling facilities. At that point, you have a refreshing recyclable water bottle in your hand. And then, you take a drive. A *long* drive. And you wind up in a much different part of the country, without any recycling facilities within hundreds of miles. And then, at long last, you finish your drink and want to recycle it.

Is it still recyclable? The essential character of the plastic water bottle has not changed. If the bottle was made of recyclable plastic when you bought it in Chicago, then presumably the bottle is made of recyclable plastic wherever you end up.

7-Eleven did not make any representations about the likelihood that the products would be recycled. True, maybe consumers have unreasonable expectations about how often products are recycled. But that's not on 7-Eleven.

A different holding would have potentially sweeping implications. The media is full of stories these days about how little recyclable waste is actually recycled. *See, e.g.*, Erin McCormick *et al.*, *Where Does Your Plastic Go? Global Investigation Reveals America's Dirty Secret*, The Guardian, June 17, 2019 ("Experts estimate that 20% to 70% of plastic entering recycling facilities around the globe is discarded because it is unusable."); Renee Cho, *Recycling in the U.S. is Broken. How Do We Fix it?*, Columbia Climate School: State of the Planet (Mar. 13, 2020) ("[W]hile many Americans dutifully put items into their recycling bins, much of it does not actually end up being recycled."); Grace Hauck, *Where Your Recycling Actually Goes – and What You Can Do about it this Earth Day*, USA Today, Apr. 22, 2022 ("The truth is, most

30

products put in U.S. recycling bins don't go where Americans think they do."); Livia Albeck-Ripka, *Your Recycling Gets Recycled, Right?  Maybe, or Maybe Not*, NY Times, May 29, 2018 ("In recent months, in fact, thousands of tons of material left curbside for recycling in dozens of American cities and towns . . . have gone to landfills."); Taylor Telford, *U.S. plastics recycling rate slumps below 6 percent, analysis finds*, Washington Post (May 4, 2022) ("Americans are recycling far less plastic . . . with rates falling below 6 percent in 2021.");[2] Emily Barone, *U.S. Plastic Recycling Rates Are Even Worse Than We Thought*, Time (May 19, 2022) ("It's well established that the state of U.S. plastics recycling is dismal.  But plastic waste experts, who have long cautioned that the Environmental Protection Agency's (EPA) purported recycling rate was overestimated, now say that the country is poised for a reckoning.  In 2018, the last time the agency analyzed where the nation's trash ends up, the plastics recycling rate came in at about 9%, meaning that more than 91% of plastics generated that year were put in a landfill or incinerated for energy.  Now, a report from . . . [an environmental group] indicates that the rate in 2021 was under 5%, cutting the previous estimate nearly in half."); Environmental Protection Agency, *Advancing Sustainable Materials Management:  2018 Fact Sheet* (Dec. 2020) (estimating that 8.7% of plastic generated in the United States is recycled).

As it turns out, most recyclable plastic in the economy is not, in fact, recycled.  By the sound of things, it is usually buried, burned, or shipped overseas for burial or burning.  Until recently, much of the "recycled" plastic was shipped abroad, but foreign countries are accepting less of our trash these days.  *See, e.g.*, Kevin Loria, *The Big Problem with Plastic*, Consumer Reports (Sept. 8, 2021) ("Until 2018, the U.S. shipped as much as half of its plastic recycling

---

[2]  A few of these articles appear to address the percentage of plastic that is recycled, not the percentage of *recyclable* plastic that is recycled.  Still, it is directionally correct.  The point is that not much plastic is actually recycled.

abroad, mostly to China and Hong Kong (where it was not always recycled). Tired of dealing with contaminated plastic bales that were largely waste, China in 2018 stopped taking all but the most pristinely sorted plastic. Other countries quickly followed suit. With fewer offshore disposal options, more and more plastic is piling up in the U.S., where it is landfilled or routed to municipal solid waste incinerators . . . .").

If that's the case, can a consumer of any run-of-the-mill recyclable product sue the manufacturer, on the theory that the product is *unlikely* to be recycled? Can every purchase of every recyclable plastic product in the country give rise to a claim, if most recyclable plastic ends up in a landfill or an incinerator?

For example, consider a water bottle – the type you can get in any vending machine. Let's assume that the plastic water bottle falls into the category of RIC No. 1, and let's assume that it is the cheapest and easiest type of plastic to recycle. Imagine if 100 eco-friendly consumers put the empty bottles in recycling bins, but only 20% of the bottles were, in fact, recycled. In the end, most of the bottles ended up buried or burned. Could the consumers bring a claim against the water company if the bottles said that they were recyclable?

The average consumer may not know that few recyclable water bottles are actually recycled – even if placed in a recycling bin – given the dynamics and economics of the recycling industry. Still, it is hard to see why a manufacturer should be on the hook for deception when the consumer brings misinformation or unrealistic expectations into the picture.[3]

Maybe the average consumer expects that "recyclable" products will be recycled. But that's not what that word means. Expectations are one thing; representations are another.

---

[3] If a consumer has an inaccurate understanding or an unrealistic expectation about the likelihood of recycling, is that person still a reasonable consumer?

7-Eleven did not create the unreasonable expectations through misrepresentations, so it is difficult to see why it should be on the hook for them.

To be sure, the question is what a reasonable consumer thinks. Consumers do not walk into 7-Elevens with dictionaries in their back pocket. Courts don't expect consumer to parse packaging like lawyers. *See Bell*, 982 F.3d at 476 ("Consumer-protection laws do not impose on average consumers an obligation to question the labels they see and to parse them as lawyers might for ambiguities, especially in the seconds usually spent picking a low-cost product."). And consumer-protection laws must meet consumers where they are. *Id.* at 481 ("What matters here is how consumers actually behave – how they perceive advertising and how they make decisions."). A "reasonable consumer" does not mean a fully informed consumer with perfect information. It means a normal person in the real world: your Average Joe on the street.

Still, there are limits on the pliability of words. Like the rest of us, words can be stretched only so far. And here, recyclable simply does not mean "will be recycled" or "likely to be recycled." It means "can be recycled."

The complaint relies on the FTC's "Green Guides," which provide guidance about when it is deceptive to represent that a product is recyclable. *See* Cplt., at ¶ 26 (Dckt. No. 23-1). It is not clear how useful those Green Guides are when evaluating the views of a reasonable consumer at a convenience store. Your average consumer at 7-Eleven probably doesn't have the FTC's policy statements at his or her fingertips when picking up a bag of foam plates for the backyard BBQ. *Cf. Karlinski v. Costco Wholesale Corp.*, 2022 WL 2867383, at *9 (N.D. Ill. 2022) ("At best, Plaintiff's gesturing to federal regulations surrounding food labeling supports his theory that consumers would be misled. . . . [T]hat does not help his case much, if at all, because 'average consumers are not likely to be aware of the nuances of the FDA's

regulations.'") (citation omitted); *Bell*, 982 F.3d at 481 ("[A]verage consumers are not likely to be aware of the nuances of the FDA's regulations defining 'grated cheese.'"); *Cerretti v. Whole Foods Market Group, Inc.*, 2022 WL 1062793, at *4 (N.D. Ill. 2022) (reaching the same conclusion about ice cream bars and the FDA's interpretation of the word "chocolate"). People buying red party cups at 7-Eleven are more likely to be thinking about beer pong than the FTC's consumer guidelines.[4]

In sum, the Court holds that the complaint fails to state a claim, at least in part. The complaint is dismissed to the extent that Plaintiff contends that the products are not recyclable because of the unavailability of recycling facilities.

### 2. The Lack of RIC Designations

The allegations about the lack of RIC markings are another story. The complaint alleges that the products lack RIC markings on the products themselves. And without the markings, the products can't be recycled.

The complaint alleges that RIC numbers are essential to recycling, because recycling facilities need to know the type of material to sort it properly. But two of the four products – the foam plates and the freezer bags – lack RIC numbers. *See* Cplt., at ¶¶ 22–23, 30–32 (Dckt. No. 23-1). Without an RIC number, the plates "cannot be separated in the recycling process and actually be recycled." *Id.* at ¶ 22. The same is true of the freezer bags: "there is no way for the Freezer Bags to be separated during the sorting process and they cannot be recycled." *Id.* at ¶ 32.

---

[4] One provision of the Green Guides encourages a disclaimer if the product is not recyclable by a "substantial majority of consumers or communities where the item is sold." *See* 16 C.F.R. § 260.12(b)(2). According to the FTC, "substantial majority" means 60%. *See* 16 C.F.R. § 260.12(b)(2). Illinois law looks to the FTC's interpretations to guide the meaning of the state statute. *See* 815 ILCS 505/2 ("In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act."). But the FTC's reading is not dispositive, either – the statute simply requires a court to give "consideration" to the FTC's approach. *Id.*

That theory is about the inherent qualities of the product itself. Curtis basically alleges that the product is destined for burial or burning, no matter what happens after it hits the recycling bin. Even if there was a recycling facility on every nearby street corner, it would not matter, because there is nothing that they can do. They can't recycle these products because 7-Eleven did not give them the information that they need to recycle it.

The recycling industry is not with 7-Eleven's control. The recycling industry is extrinsic to the product sold by 7-Eleven. But 7-Eleven does control the product. And in particular, 7-Eleven controls the markings on the product, including whether the product has an RIC number. An RIC number is intrinsic to the product, and it is within 7-Eleven's control to include it (or not).

Plaintiff's allegations about the lack of an RIC number address the products themselves. The products need to have RIC numbers to be recyclable, but they don't have RIC numbers. The problem is intrinsic to the products. As is, before they hit the recycling bin, they are not recyclable. So, the complaint survives to the extent that it alleges that the products lack RIC numbers.

### B.     Actual Damages

The second issue, the existence of actual damages, isn't much of an issue. At least not here.

A plaintiff must establish "actual damages" for an ICFA claim. *See Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 322 (7th Cir. 2021); *Benson*, 944 F.3d at 646; *see also Lewis v. Lead Indus. Ass'n*, 2020 IL 124107, 449 Ill. Dec. 195, 178 N.E.3d 1046, 1056 (2020) ("Courts have long considered an actual injury to be an essential element of fraud."); *Rosenbach v. Six Flags Ent. Corp.*, 2019 IL 123186, 432 Ill. Dec. 654, 129 N.E.3d 1197, 1204 (2019) ("To bring a

private right of action under [the ICFA], actual damage to the plaintiff must be alleged."). To plead actual damages, a plaintiff must allege "actual pecuniary loss." *See Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010).

Strictly speaking, injury under Article III is distinct from actual damages under the statute. *See Castillo*, 2022 WL 704809, at *4 ("Although their alleged financial injury establishes Article III standing under *Aqua Dots*, Plaintiffs still must show that the alleged injuries are compensable, as a matter of state law, to avoid dismissal on the merits.") (cleaned up); *Spector v. Mondelez Int'l, Inc.*, 178 F. Supp. 3d 657, 673 (N.D. Ill. 2016).

But here, they cover the same ground. Curtis alleges that she would not have purchased the 24/7 Life products – or would have paid less for them – if she had known that the items were not recyclable. *See* Pl.'s Mem., at 12–13 (Dckt. No. 17). That's enough to state a claim that Curtis suffered actual damages. A motion to dismiss is about notice pleading, and 7-Eleven is on notice.

## III. Breach of Express Warranty (Count II)

The second claim is breach of warranty. To state a claim under Illinois law, a plaintiff must allege that a seller: "(1) made an affirmation of fact or promise; (2) relating to the goods; (3) which was part of the basis for the bargain; and (4) guaranteed that the goods would conform to the affirmation or promise." *O'Connor v. Ford Motor Co.*, 477 F. Supp. 3d 705, 714 (N.D. Ill. 2020).

7-Eleven challenges only the first element, arguing that Curtis cannot "identify any express statement that the products she purchased would be recycled." *See* Def.'s Mem., at 9 (Dckt. No. 13). Without an affirmation of fact or promise, Curtis's express warranty claim must fail. *Id.* at 9 (citing *Anthony v. Country Life Mfg., LLC.*, 70 F. App'x 379, 383 (7th Cir. 2003)).

7-Eleven contends that the ICFA claim and the express warranty claim should rise or fall together. *See* Def.'s Reply, at 11 (Dckt. No. 20) (citing *Spector*, 178 F. Supp. 3d at 674).

Here, Plaintiff's ICFA claim survives, at least in part. 7-Eleven advances no other argument, so the express warranty claim survives to the same extent as the ICFA. It survives to the extent that it covers claims about the lack of RIC designations.

## IV.     Unjust Enrichment (Count III)

Curtis's unjust enrichment claim relies on the same allegations. She alleges that 7-Eleven deceptively labels its 24/7 Life products as "recyclable" when they are not recyclable.

Where "an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim – and, of course, unjust enrichment will stand or fall with the related claim." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011). Because the Court finds that Curtis's ICFA claim survives in part, her unjust enrichment claim survives as well (again, to the extent that it covers claims about the lack of RIC designations).

### Conclusion

For the foregoing reasons, Defendant's motion to dismiss is granted in part and denied in part. The Court grants the motion to dismiss the demand for injunctive relief. The Court dismisses the claim under the ICFA (Count I) to the extent that it rests on the unavailability of recycling facilities or the likelihood that the products will, in fact, be recycled. The claim under the ICFA survives to the extent that it rests on an allegation about the lack of RIC numbers. The breach of warranty claim (Count II) and the unjust enrichment claim (Count III) survive to the same extent. The motion to dismiss is otherwise denied.

Date:   September 13, 2022

_____
Steven C. Seeger
United States District Judge