```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   DEVON CURTIS, individually and   )
     on behalf of all others         )
 4   similarly situated,             )
                                     )
 5                   Plaintiff,      )
                                     )   Case No. 21 CV 6079
 6   -vs-                            )
                                     )   Chicago, Illinois
 7   7-ELEVEN, INC., a Texas         )   July 18, 2024
     Corporation,                    )   12:16 p.m.
 8                                   )
                     Defendant.      )
 9
                      TRANSCRIPT OF PROCEEDINGS - Motion
10           BEFORE THE HONORABLE STEVEN C. SEEGER

11   APPEARANCES:

12   For the Plaintiff:       McGUIRE LAW, P.C.
                              BY:  MR. EUGENE Y. TURIN
13                            55 West Wacker Drive
                              9th Floor
14                            Chicago, IL  60601

15
     For the Defendant:       WINSTON & STRAWN
16                            BY:  MR. FRANK BATTAGLIA
                              35 West Wacker Drive
17                            Chicago, IL  60601

18

19

20

21

22   Court Reporter:         AMY M. KLEYNHANS, CSR, RPR, CRR
                             Federal Official Court Reporter
23                           United States District Court
                             219 South Dearborn Street, Room 2318A
24                           Chicago, IL  60604
                             Telephone:  (312) 818-6531
25                           amyofficialtranscripts@gmail.com
```

1      (Proceedings heard in open court.)

2          THE CLERK:  21 CV 6079, Curtis versus 7-Eleven,

3  Incorporated.

4          THE COURT:  Good afternoon, folks.

5          Come on up, please.

6          Good afternoon.

7          Let's get everyone's appearances on the record, if

8  you would, please.

9          Start with counsel for the plaintiff.

10          MR. TURIN:  Good afternoon, Your Honor.

11          Eugene Turin for the plaintiff.

12          THE COURT:  Good afternoon.

13          MR. BATTAGLIA:  Good afternoon, Your Honor.

14          Frank Battaglia for Defendant 7-Eleven.

15          THE COURT:  All right.  Very good.

16          Thank you, folks, for being here.

17          I'm going to give you a double-barreled thank you to

18  start for two reasons.  Number one, I had scheduled today --

19  today's hearing and I moved it back a little bit.  I think we

20  were originally set for 11:00, I think, and we moved it to

21  noon.  I had a couple of cases today that went long.  I had a

22  case involving someone who was killed by the Joliet Police

23  Department, and then I had another case where the lawyer just

24  died.

25          So, we've had a difficult morning.  So, I had to show

1    a little TLC to those people, so I had to move those hearings.

2    And as a result of that, not only did we move it to noon, but

3    we're at 12:15 today.  So, I just want to start by

4    acknowledging that I respect you and your time, and I'm sorry

5    to keep you waiting.

6              Thank you for being here.

7              I have called you in today because I am going to give

8    you an oral ruling on the motion to certify.  I'm going to do

9    what Judge Shadur so often did, is read you my ruling.

10             And I'm going to invite you to go ahead and take your

11   seat so you can be more comfortable.  That way all of us can

12   sit in the squishy chairs, if you don't mind.

13             MR. BATTAGLIA:  Thank you, Judge.

14             MR. TURIN:  Thank you, Your Honor.

15             THE COURT:  Let me start by acknowledging what you

16   must be thinking and what I'm thinking.

17             You undoubtedly would prefer a written ruling.  You'd

18   prefer an opinion.  You would prefer something in writing.

19   We're on the same page, literally and figuratively.  I would

20   prefer to give you a written ruling.  I enjoy writing

21   opinions.  There's value in having a written opinion for a lot

22   of reasons.  I know that.  I acknowledge that.

23             I would prefer to give you one.  But here's the

24   reality:  It is not possible for a district court judge in the

25   Northern District of Illinois to write an opinion on all of

1    the motions that are pending, even on important motions.

2    Every judge in this building has hundreds and hundreds of

3    cases and hundreds and hundreds of motions.  I have well over

4    300 civil cases.  And I get, you know, 30-some new cases every

5    month.  That's just the civil caseload.

6          It is just not physically possible for me to write on

7    every issue that I want to write on.  I've already issued an

8    opinion on this -- I'm sorry.  I already issued a written

9    opinion in this case.  I gave you the written ruling on the

10   motion to dismiss.  I cannot write an opinion on everything I

11   want to write about.  I would love to put this opinion out in

12   writing.  I just can't.  I just can't.  For bandwidth reasons.

13         I also am sensitive to the fact that this case was

14   filed in 2021.  You've been waiting for a ruling.

15         Thank you for your patience.

16         In the interest of speed, I thought that my draft

17   opinion could be read to you instead of putting the spit

18   polish on it and put it in writing.

19         If you want a written copy of what I say, you can

20   order a transcript.  The court reporter would be happy to give

21   it to you.

22         So, you will have a written record of what my ruling

23   is going to be; it's just not going to be available on

24   Westlaw.

25         I also will say this.  I have cites for all parts of

1    the record in all of the cases and all of these cites to the

2    declarations, *et cetera*.  I may or may not read them all in

3    the interest of speed.  Suffice it to say that I have a draft

4    here that's chock full of citations.

5           So, thank you for your understanding, folks, when I

6    give you an oral ruling.

7           Without further ado, here it goes.

8           7-Eleven sells more than Slurpees.  The shelves in

9    the store are chock full of a smorgasbord of things that you

10   might need in a pinch.

11          Three years ago, Plaintiff Devon Curtis stopped by a

12   7-Eleven in Chicagoland to stock up.  She bought cups, plates,

13   and freezer bags.  The products were made by one of 7-Eleven's

14   private brands.  And the packaging promoted that the cups,

15   plates, and bags were recyclable.

16          Curtis alleges that the advertising deceived her.  In

17   her view, 7-Eleven bragged that its products were recyclable

18   even though they aren't.  So, she sued.

19          Curtis filed this putative class action and alleged

20   that 7-Eleven had violated state law.  She moved to certify a

21   multistate class made up of people across nine states who

22   bought 7-Eleven foam plates, foam bowls, sandwich bags,

23   freezer bags, and sandwich bags.

24          Curtis did not carry her burden to show that the

25   proposed class satisfies the requirements of Rule 23 of the

1    Federal Rules of Civil Procedure.

2             For the following reasons, Curtis's motion to certify

3    the class is hereby denied.

4             Before getting into the analysis, let me say a few

5    more words about the background of the case.

6             The lawsuit was set in motion three summers ago.

7    Plaintiff Devon Curtis shopped at 7-Eleven.  She didn't buy

8    every product at issue in this case.  According to her

9    deposition, she bought foam cups, foam plates, and plastic

10   freezer bags.  I'm relying there on her deposition, which is

11   in the record at Docket No. 85-5.  Specifically, I'm citing

12   Pages 112 and 113 of the transcript.

13            Curtis needed the foam cups, the foam plates, and the

14   plastic freezer bags for a party.

15            The products advertised that they were recyclable.

16   I'm quoting there Page 51 of her transcript.

17            When I say "advertised," I mean it was on the

18   packaging.

19            Curtis alleges that she relied on that

20   representation.  Specifically, Curtis testified that she

21   relied on that representation.

22            I'm citing there Page 37 of her transcript of her

23   deposition.

24            According to Curtis, she would have walked out of the

25   store empty handed if they weren't recyclable.

1          The Court looked at the photographs of the products

2     on Pages 5, 7, and 8 in the amended complaint.  The amended

3     complaint is on the docket at Docket No. 31.

4          The Court also looked at the so-called concept images

5     on Pages 8 and 9 in the motion for class certification.  That

6     motion is on the docket at Docket No. 76.

7          I also looked at the images in the exhibits attached

8     to that motion, specifically, Docket No. 76-2, Docket

9     No. 76-3, Docket No. 76-4, Docket No. 76-5, and Docket

10    No. 76-6.

11         So, if anyone wants to see a picture of the products,

12    that's where you can find it on the docket.

13         As an aside, the products are not all labeled the

14    same way.

15         The Court took a close look at the photographs in the

16    complaint and the concepts attached to the motion to certify

17    to see where the recycling symbols and the text about

18    recyclability of the products appeared.

19         Again, I'm using the term "concepts."  When I say the

20    word "concepts," I don't mean like an idea.  It's more like a

21    conceptual drawing.  The parties just called it concepts, so

22    I'll use that lingo.  But when you hear me say "concepts," it

23    has to do with a depiction of what something looked like, a

24    visual depiction, a visual concept.

25         The punch line is that the front side of the product

1  packaging included recycling symbols and text referring to

2  recycling.  But those symbols and text were relatively small

3  in the grand scheme of things.  They were less prominent

4  features of the packaging than other words and phrases.

5  7-Eleven customers in a hurry might not have noticed those

6  features before making their purchases.

7       Before the Court marches through describing the

8  products, the Court wanted to flag one other point.  Curtis

9  bought some of the products and not others.  For the products

10 that Curtis purchased, the Court will largely rely on the

11 photos that she provided alongside her complaint and will note

12 where the concepts differ.

13      Again, the concepts are the conceptual

14 visualizations, the depictions.

15      For the products that Curtis did not buy herself, the

16 Court will look at the concepts only.

17      Let me start with the foam plates.

18      First, the Court looked at the pictures of the foam

19 plates.  They're in the complaint at Docket No. 31 at

20 Paragraph 21.

21      The foam plates have the word "recyclable" on the

22 front of the packaging.  "Recyclable" also appears in the

23 lower right corner alongside the -- I'm sorry.  Let me say

24 that again, folks.  Strike that.  Let me say that sentence

25 again.

1          The foam plates have the word "recyclable" on the

2     front of the packaging in the lower right corner alongside a

3     green recycling symbol; that is, the symbol with the three

4     arrows that point clockwise and bend and twist in a triangle.

5          Other features on the front of the plate's packaging

6     are more predominant.  In large, all-caps letters, the

7     packaging reads "FOAM PLATES."  The phrase "FOAM PLATES" is in

8     white text against a red backdrop.

9          In the version shown in the complaint, the white text

10    below "FOAM PLATES" reads "EXTRA STURDY & SOAK PROOF."  The

11    concept is a little different.  The concept reads "DEEP DISH,

12    CUT RESISTANT, AND LEAK PROOF" instead.

13         I'm referring there to what the parties called

14    concept, Docket No. 76-2 at Page 3 of 3.

15         Again, I feel duty-bound to say, when I use the term

16    "concept," I don't mean idea.  I mean like visual depiction,

17    like a conceptual drawing.  That's what it means.

18         All right.  So, back to the plates.

19         The message about recyclability of the product is

20    visible, but it's small.  It is significantly less predominant

21    than the message reading "EXTRA STURDY & SOAK PROOF" or "DEEP

22    DISH, CUT RESISTANT, AND LEAK PROOF."

23         I'm referring there to Paragraph 21 of the first

24    amended complaint, Docket No. 31, and the concept, which is

25    Docket No. 76-2 at Page 3 of 3.

1          In both the photo in the amended complaint and in the

2     concept, a recycling symbol appears in a yellow box at the

3     bottom of the label next to a message reading "25 plates."

4     The number "25" appears to be slightly larger than the

5     recycling symbol.  The phrase "25 plates" is in bold, whereas

6     the word "recyclable" is not.

7          All in all, the recycling symbol and the word

8     "recyclable" are visible on the front of the plate packaging,

9     but those elements are not front and center.  Instead, they're

10    in a small box on the right-hand side of the packaging, which

11    some consumers could have missed.

12         The backside of the packaging for the foam plates

13    appears in the photo attached to the amended complaint, but

14    not in the concept.  It features two recycling symbols with

15    RIC, all caps, RIC numbers on them.

16         I'm referring there to Page -- excuse me.  I'm

17    referring there to Paragraph 21 of the first amended

18    complaint, Docket No. 31.

19         It features one symbol with a "4" in the middle.  The

20    other symbol has a "6" in the middle.

21         The plates themselves do not have RIC numbers on

22    either side.  See first amended complaint at Paragraph 22.

23         That's a description of the foam plates.

24         I'll now turn to the foam cups.

25         Second, the Court looked at the foam cups.  The

1    packaging for the foam cups was similar to the packaging for

2    the foam plates.  In large font on the packaging for the foam

3    cups, white text against a red backdrop reads "FOAM CUPS."

4    I'm quoting there Paragraph 28 of the amended complaint.

5         The packaging for the foam cups in the photo for the

6    amended complaint is a little different, but not materially

7    different from the concept.  In the photo in the amended

8    complaint, smaller text underneath the words "Foam Cups"

9    reads:  "IDEAL FOR HOT & COLD BEVERAGES."  See first amended

10   complaint at Paragraph 28, Docket No. 31.

11        The concept says, "STURDY, DISPOSABLE, FOR BOTH HOT &

12   COLD BEVERAGES" instead.  See concept, Docket No. 76-2, at

13   Page 3 of 3.

14        Incidentally, many of these quotes are in all caps.

15   The transcript from the court reporter will reflect what's in

16   all caps.  I'd ask her to do that.  And thank you.

17        Beneath that, a small yellow box contains the cup

18   count next to a recycling symbol and the word "recyclable."

19        The left-hand side of the photo in the amended

20   complaint reads:  "10 16-ounce cups."  I'm quoting there

21   Paragraph 28 of the first amended complaint, Docket No. 31.

22        The text in the concept photo is a bit different.  It

23   reads:  "10 foam cups."  See concept, Docket No. 76-2, at

24   Page 3 of 3.

25        Then, there is a slash mark.  See first amended

1    complaint at Paragraph 28, Docket No. 31.  And the concept,

2    Docket No. 76-2, at Page 3 of 3.

3         On the other side of the mark, a green recycling

4    symbol appears next to the word "recyclable."  The "10" is

5    about the same size but slightly more predominant than the

6    recycling symbol.  The phrase "10 16 oz. CUPS" or "10 foam

7    cups" is in bold, but the word "recyclable" is not.

8         Overall, the most predominant labeling on the foam

9    cups packaging is the name of the product:  "FOAM CUPS."  The

10   recycling symbol and the word "recyclable" appear on the front

11   of the bag, but those elements are less predominant than the

12   phrases "IDEAL FOR HOT & COLD BEVERAGES" and "10 16 oz.

13   CUPS."

14        The cups themselves feature an RIC No. 6 symbol on

15   them.  See first amended complaint at Paragraph 28, Docket

16   No. 31.  The complaint does not include an image of the back

17   of the bag.

18        So that's the summary of the foam cups.

19        I'll now turn to the party cups.

20        Third, the party cup label is very similar to the

21   foam cup label.  Predominant text reads "PARTY CUPS" in white

22   font against a red backdrop.  I'm quoting there Paragraph 29

23   of the complaint.  The words "FOR COLD BEVERAGES" appear

24   beneath that.

25        Then, in a smallish yellow box, the cup count and

1   words "recyclable" appear in red text.  The cup count reads"

2   "20 18 oz. CUPS."  Then, there is a slash mark.  After the

3   slash mark, there is a green recycling symbol next to the word

4   "recyclable."

5           The cup count is in bold, but the recycling symbol,

6   which is a Kelly green, is hard to make out against the yellow

7   backdrop.  The recycling symbol on the party cups is harder to

8   see than the recycling symbol on the foam cups label.  The

9   word "recyclable" is not in bold, either.

10          Overall, the "recyclable" message is the fourth most

11  predominant textual aspect of the packaging after the words

12  "PARTY CUPS," "FOR COLD BEVERAGES," and "20 18 oz. Cups."

13  Although, the message about recycling is visible on the front

14  of the bag, it's off to the side and harder to read than the

15  other aspects of the packaging.

16          The cups themselves contain an RIC No. 5 on the

17  bottom.  The complaint does not include an image of the back

18  of the bag.  Curtis did not file a concept image for the party

19  cups.

20          So, that's my description of the party cups.

21          I'll now turn to the freezer bags.

22          Fourth, the recyclable labeling on the freezer bags

23  is even less predominant than the labeling on the foam plates,

24  foam cups, and party cups.  See the amended complaint at

25  Paragraph 30.  Also see the concept, which is Docket No. 76-6,

1   at 2 of 2.

2           The packaging for the freezer bags shown in the

3   amended complaint appears to be exactly the same as the

4   concept.  The most predominant aspect of the labeling is all

5   caps text on the front of the packaging describing the product

6   as "FREEZER BAGS."  That text is white against a blue

7   backdrop.  It appears next to a large drawing of bell peppers

8   inside of a freezer bag.

9           Smaller writing underneath the "FREEZER BAGS" text

10  reads:  "reclosable."  That text, although still predominant,

11  is in all lowercase letters, not in all caps.  It's much

12  smaller than the words "FREEZER BAGS."

13          Underneath the words -- excuse me.  Underneath the

14  words "reclosable," two smaller messages appear.  One reads

15  "MADE WITH RECYCLABLE POLYETHYLENE."  The other describes the

16  size of the bags.  "10.56 inches times 10.75 inches."

17          Both of those phrases are the same size.  The message

18  about the bag size is written in white font; whereas, the

19  message about the recyclable polyethylene is written in yellow

20  font.

21          The white font shows up more clearly against the blue

22  background than the yellow font.  So, the message about the

23  bag size is slightly easier to read than the message about the

24  recyclable polyethylene, even though both messages are the

25  same size.

1          The back of the freezer bag box contains more

2     information about recycling.  Specifically, in the left-hand

3     corner, text next to a recycling symbol states that the carton

4     is "Made of 100% Recyclable Materials.  Please Recycle."

5          In the right corner, there is a certification seal.

6     It contains text reading:  "100% Recycled Paperboard."

7          So, the back of the box includes text about

8     recycling.  But that text is about the recyclability of the

9     box itself, not the plastic bags inside the box.  The back of

10    the box does not appear to include any information about

11    whether the products inside the box are recyclable.

12         The complaint does not include any photos of other

13    products.  So, the descriptions of the remaining products are

14    based solely on the concepts.

15         I'll now turn to the foam bowls.

16         This is number five.

17         Fifth, the packaging for the foam bowls shown in the

18    concept is very similar to the packaging for the foam plates.

19    Large white text reading "FOAM BOWLS" is in all caps against a

20    red backdrop, and it predominates.  It looms large.

21         See concept at Docket No. 76-3, Page 2.

22         Smaller text below reads "Extra Sturdy & Soak Proof."

23         In a small yellow box underneath, the left-hand side

24    reads "30 BOWLS" in bold, all-caps font.  The right-hand side

25    says "Recyclable" in unbolded font next to a green recycling

1    symbol.

2            That's my description of the foam bowls.

3            I'll now go to the sixth product at issue, meaning

4    the other bags.

5            Six, there are concepts for other bags in addition to

6    freezer bags.  Specifically, there are concepts for sandwich

7    bags and snack bags.  The packaging for those bags is very

8    similar to the freezer bag packaging with almost exactly the

9    same labeling.

10           First, I'll talk about the sandwich bags.

11           Large white text reads "SANDWICH BAGS" against a pink

12   background next to an image of a sandwich in a plastic bag.

13   Take a look at the concept.  It's in the docket at 76-4, at

14   Page 2 of 2.  Then, smaller lower text says "reclosable.

15           Underneath that, even smaller text in yellow reads:

16   "MADE WITH RECYCLABLE POLYETHYLENE."

17           The snack bag packaging likewise features large white

18   all caps text describing the product:  "SNACK BAGS."  See

19   concept, Docket No. 76-5, at 2 of 2.  That text appears

20   against a purple background next to a drawing of strawberries

21   in a plastic bag.

22           White lowercase text underneath "SNACK BAGS" reads:

23   "Reclosable."  Then, smaller yellow letters read "MADE WITH

24   RECYCLABLE POLYETHYLENE."

25           I have just given you a verbal description of the

1  pictures that I've seen on the docket.  I've given you a

2  verbal description of the following products:  foam plates,

3  foam cups, party cups, freezer bags, foam bowls, and other

4  bags.

5         If nothing else today, I think I've just proven the

6  point that a picture is worth a thousand words because I've

7  given you an untolled number of words, and I have done so in

8  an attempt to describe for you what I'm seeing.

9         If any interested reader wants to see the products

10 themselves and get a bird's eye view of what they look like, I

11 would invite you to take a look at the pictures on the docket.

12 That's why I gave you the docket cites.  If anyone wants to

13 just look at it and see it for themselves, that's where you

14 could find it.  I just wanted to show on the record that I

15 have looked at the products.  I'm familiar with what they look

16 like.  I'm familiar with the symbols and where they appear and

17 what the products say.

18        Again, when it's word versus pictures, pictures

19 always win.  But take a look for yourself.

20        Let me summarize what I've done so far as follows.

21        Across the board, the packaging doesn't reach out and

22 grab the reader with a bold declaration that the products are

23 recyclable.

24        A reasonable consumer could see messaging about

25 recycling if the consumer looked at the packaging.  But the

1    messages about recycling are not the most predominant phrases

2    on the packaging, either.  A customer doesn't -- excuse me.  A

3    customer who doesn't care about whether the cups or plates are

4    recyclable could miss the messaging about recycling

5    altogether.

6          Let me say this so no one misunderstands what I'm

7    saying.  I am not saying that you can only have a claim if

8    it's the most prominent thing on the packaging.  That's not

9    what I'm saying.  I'm not saying that it can be a class only

10   if it's the most prominent thing on the packaging.  I am not

11   saying that.  I am just telling you what I see.  That's all

12   I'm doing at this point.  I'm just giving you a description.

13   And it is unavoidably true that the packaging does contain

14   statements about recycling and recyclability, but it is also

15   unavoidably true that those statements are not particularly

16   prominent.  They're not particularly prominent.  They're

17   harder to see, and they're given less emphasis than other

18   parts of the packaging.  That's all I'm saying.  I'm just

19   describing what I'm seeing.  So, please don't anyone read

20   anything too into it -- too much into it at this point.

21         In any event, Curtis alleges that the advertising was

22   deceptive.  She says that the advertising was deceptive

23   because the products wouldn't actually be recycled and

24   wouldn't enjoy a second life.  She alleges that they actually

25   end up being disposed as regular waste products.  See amended

1    complaint at Paragraph 40.

2          To the landfill, they go, according to her.

3          Put differently, Curtis thinks that 7-Eleven duped

4    her when it misrepresented the recyclability of the products.

5    She thinks that 7-Eleven was green-baiting customers into

6    buying things.  I'm referring there to her deposition at

7    Page 5, Docket No. 85-5.

8          To right the wrong, she filed suit on behalf of

9    herself and a putative class, and she brought three claims.

10   See amended complaint at Paragraph 41, Docket No. 31.

11         First, Curtis invoked a swath of state consumer

12   protection laws, including the Illinois Consumer Fraud and

13   Deceptive Business Practices Act.  See Paragraph 50 of the

14   amended complaint.

15         She alleged that 7-Eleven "affirmatively represents

16   and advertises that its 24/7 Life plastic products are

17   recyclable, when in fact in practice they are not."  I'm

18   quoting there Paragraph 53 of the amended complaint.

19         Second, Curtis alleged that 7-Eleven breached an

20   expressed warranty.  Specifically, she alleged that 7-Eleven

21   breached its warranty that the products could be recycled.

22   Take a look at Paragraph 61 and 65 through 68 of the amended

23   complaint.

24         I'm sorry.  Let me say that again.  That's just

25   Paragraph 61 of the amended complaint.  Excuse me.

1          Third and finally, Curtis alleged unjust enrichment.

2     That's covered in Paragraph 65 to 68 of the amended complaint.

3          So, to summarize, you've got a consumer protection

4     claim -- a consumer fraud claim, that is; second, you've got

5     an expressed warranty claim; and third, you've got an unjust

6     enrichment claim.

7          This Court already had an opportunity to take a

8     gander through the claims in the world of recycling.  The

9     Court granted 7-Eleven's motion to dismiss in part and denied

10    it in part.  I issued that ruling in September of 2022.  It's

11    on the docket at Docket No. 24.

12         Today's task is different.  The Court is left with

13    the claim -- claims that survived in part.  The Court asked

14    for a class, and the requested class is the issue before me.

15         Curtis asked me to certify a class, and that ask is a

16    big ask.  Curtis moved to certify not just an Illinois class,

17    but a multistate class.  Take a look at the motion to certify.

18    It's Docket No. 76.

19         Specifically, Curtis asked the Court to certify a

20    Rule 23(b)(3) class consisting of all people who, in the

21    relevant limitations period, bought 7-Eleven brand foam

22    plates, foam bowls, snack bags, freezer bags, and sandwich

23    bags in Illinois, California, Florida, Massachusetts,

24    Michigan, Missouri, New Jersey, New York, and Washington.

25         That's nine states from across the country, from

1    coast to coast.

2           So, without further ado, I'll now turn my attention

3    to the legal standard.  And I'll turn my attention to Rule 23

4    of the Federal Rules of Civil Procedure.

5           Let me start by saying that you folks know the

6    standard for class certification like the back of your hand.

7    Let me just be brief.  You're familiar, for example, with the

8    text of the rule, as am I.

9           A "proposed class under Rule 23(b) must meet the

10   requirements of Rule 23(a) -- numerosity, typicality,

11   commonality, and adequacy of representation -- and one of the

12   alternatives listed in Rule 23(b)."  See *Howard v. Cook County*

13   *Sheriff's Office*, 989 F.3d 587, 597, Seventh Circuit 2021.

14   See also Rule 23.

15          The class also must satisfy Rule 23's "implicit

16   requirement of ascertainability," meaning that the class is

17   "defined clearly and based on objective criteria."  See

18   *Mullins v. Direct Digest, LLC*, 795 F.3d 654, 659, Seventh

19   Circuit 2015.

20          As the movant, the plaintiff bears the burden of

21   proof.  The plaintiff bears the burden of proving that her

22   proposed class satisfies Rule 23 by a preponderance of the

23   evidence.  See *Howard*, 989 F.3d at 597.

24          "Failure to meet any of the rule's requirements

25   precludes class certification."  See *Arreola v. Godinez*, 546

1    F.3d 788 at 794, Seventh Circuit 2008.

2            "Rule 23 is more than a pleading standard."  See

3    *Howard*, 989 F.3d at 597.  Also take a look at *Wal-Mart Stores,*

4    *Inc., v. Dukes*, 564 U.S. 338 at 350, Supreme Court 2011.

5            A Court does not take the plaintiff's allegations at

6    face value when evaluating the Rule 23 factors.  Instead, a

7    Court must "go beyond the pleadings and, to the extent

8    necessary, take evidence on disputed issues that are material

9    to certification."  See *Beaton v. SpeedyPC Software*, 907 F.3d

10   1018 at 1025, Seventh Circuit 2018.  The analysis must be

11   "rigorous" too.  See *Wal-Mart*, 564 U.S. at 351.

12           A Court's analysis might "entail some overlap with

13   the merits of plaintiff's underlying claim.  That cannot be

14   helped."  *Id.*

15           But "the merits themselves are not on the table at

16   this early stage."  See *Howard*, 989 F.3d at 597.  Courts

17   cannot "engage in free-ranging merits inquiries at the

18   certification stage."  See *Amgen v. Connecticut Retirement*

19   *Plans and Trust Funds*, 568 U.S. 455 at 466, 2013.

20           That's the overarching explanation of the legal

21   standard.

22           Let me get a little more granular.

23           Rule 23's requirements curb abusive class actions.

24   The rule gives district courts a checklist to make sure that

25   the class actions don't bulge in exception into the norm.

1          Courts have a responsibility to apply the rule and

2   apply it with vigor.  See *Wal-Mart*, 564 U.S. at 351.

3          Specifically, Rule 23(a) spells out the prerequisites

4   that every class action must satisfy.  A plaintiff may sue as

5   a representative party on behalf of a class if:  "(1) the

6   class is so numerous that joinder of all members is

7   impracticable; (2) there are questions of law or fact common

8   to the class; (3) the claims or defenses of the representative

9   parties are typical of the claims or defenses of the class;

10  and (4) the representative parties will fairly and adequately

11  protect the interest of the class."  I'm quoting there

12  Rule 23(a).

13         Any savvy class-action attorney can rattle off those

14  requirements in a digestible, bite-sized list.

15         Here it is.

16         Number one, numerosity.  Number two, commonality.

17  Number three, typicality.  And number four, adequacy of

18  representation.

19         It rolls off the tongue.  Numerosity, commonality,

20  typicality, and adequacy of representation.

21         A class action must also fit into one of Rule 23(b)'s

22  boxes.  Here, Curtis wants to certify the class as a Rule

23  23(b) action.  So, Rule 23(b)(3) -- I'm sorry.  Let me say

24  that again.

25         Here, Curtis wants to certify the class as a

1  Rule 23(b)(3) action.  So, Rule 23(b)(3) introduces another

2  requirement:  predominance.  That's a long way of saying

3  Rule 23(b) requires predominance.

4         To qualify as a Rule 23(b)(3) action, this Court must

5  find that "the questions of law or fact common to class

6  members predominate over any questions affecting only

7  individual members, and that a class action is superior to

8  other available methods for fairly and efficiently

9  adjudicating the controversy."  I'm quoting there Rule

10  23(b)(3).

11         Let me say the first part of that rule again.

12         The Court must find that "the questions of law or

13  fact common to class members predominate over any questions

14  affecting only individual members."

15         That's the predominance standard.  Notice the word

16  "predominate."

17         The Supreme Court has "discussed predominance in

18  broad terms" and explained that the purpose is to determine

19  "whether a proposed class is sufficiently cohesive to warrant

20  adjudication by representation."  See *Messner v. Northshore*

21  *University HealthSystem*, 669 F.3d 802 at 814, Seventh Circuit

22  2012.

23         That is the overarching framework.  I'm now going to

24  discuss the predominance requirement under Rule 23(b)(3)

25  because that is where I'm going to primarily hang my class

1    certification hat.

2          I will begin by addressing the fact that Curtis

3    requests a multistate class that covers claims under the laws

4    of several states.  That's the first reason why I think the

5    proposed class fails the predominance requirement.

6          The predominance requirement often comes up when a

7    plaintiff tries to certify a multistate class.  Specifically,

8    the choice-of-law question might present a hurdle.

9          A leading treatise made this point.  "Some class

10   actions consisting of individuals from multiple states arise

11   under state law.  In such cases, the applicable choice of law

12   rules might call for the application of different state laws

13   to the various class members.  If that's the case, common

14   issues may not predominant."  I'm quoting there Volume 2 of

15   *Newberg and Rubenstein on Class Actions*.  Specifically, I'm

16   quoting Section 4:61.  I'm quoting the 6th edition from 2024.

17         If a class is filled with multistate members and the

18   claims by the class members are governed by state laws with

19   different standards, the class might fall short of the

20   predominance requirement of Rule 23(b)(3).

21         In other words, if you've got a lot of people from a

22   lot of states under a lot of laws, common questions may not be

23   predominant.

24         Sometimes Courts address the differences between

25   state laws in the context of commonality and superiority.  A

1    good example is *In re Bridgestone/Firestone*, 288 F.3d 1015.

2    So sometimes the issue of state laws comes up in those

3    requirements under Rule 23.  But differences between state

4    laws can create predominance issues, too, and thus create an

5    issue under Rule 23(b)(3).

6          The Seventh Circuit has made that point a few times.

7    For example, it has said that the "application of

8    choice-of-law principles . . . may affect whether a class

9    should be certified -- for a class action arising under the

10   consumer-fraud laws of all 50 states may not be manageable,

11   even though an action under one state's laws could be."  See

12   *Morrison v. YTB International Incorporated*, 649 F.3d 533, 536,

13   Seventh Circuit 2011.

14         In another case, the Seventh Circuit explained that

15   "state laws may differ in ways that could prevent class

16   treatment if they supplied the principal theories of

17   recovery."  See *In re Mexico Money Transfer Litigation*, 267

18   F.3d 743 at 747, Seventh Circuit 2011 -- excuse me -- Seventh

19   Circuit 2001.

20         In any event, the takeaway is clear.  A district

21   court has some choice-of-law work to do when a plaintiff moves

22   to certify a multistate class with state claims.  See the

23   *Shell Oil Company* case, 5 -- excuse me -- 256 F.3d at 580,

24   583, Northern District of Illinois 2008.

25         "In cases where the plaintiffs seek to assert state

1   common law or statutory claims and seek to certify a class

2   that includes members from multi-" -- excuse me -- "from

3   multiple states, the Court must address choice-of-law issues."

4   See Volume 1 of *McLaughlin on Class Actions*.  Specifically,

5   Section 5:46, 20th edition 2023.

6           A Court must figure out, quote -- I'm sorry.  Let me

7   say that again.

8           A Court must figure out "if variations in state law"

9   will "swamp" the common issues and "defeat" predominance.  See

10  *Castano v. American Tobacco Company*, 84 F.3d 734 at 741.

11          In other words, the Court has to figure out if the

12  variations in state law are going to overtake the ball game.

13          Courts need to take a close look.  State consumer

14  protection laws might "vary considerably."  See *In re*

15  *Bridgestone/Firestone*, 288 F.3d at 1018.

16          Here is the rub.  This Court would have done the

17  analysis if Curtis had set up the issue.  But Curtis did not

18  put the ball on the tee.  Curtis's motion for class

19  certification did not meaningfully engage the choice-of-law

20  issue.  Take a look at the motion to certify, Docket No. 76.

21          Curtis stated that the fact that she seeks a

22  multistate class does not "create individualized issues that

23  predominate."  I'm quoting there Page 17 of the motion to

24  certify, Docket No. 78.

25          Curtis argued that other Courts have found that the

1    consumer protection laws in the relevant states had

2    "sufficient common characteristics."  I'm quoting there

3    Pages 17 to 18.

4         But candidly, Curtis did not give this Court any

5    detail about each of those laws.  At the end of the day, it's

6    my responsibility to ensure that the individual states would

7    not have differences between the laws and that those laws

8    would not create problems from a predominate standpoint.  And

9    what I have from the plaintiff here is just not enough.

10        The entire argument from Curtis is about three

11   sentences long.  That's not enough.

12        7-Eleven seized on the cursory presentation.  See

13   defendant's brief in this.  It's Page 13 and 17 of their

14   brief, including Page 13, Note 7, Docket No. 85.

15        Here's what 7-Eleven said.

16        First, 7-Eleven focused on the statutory consumer

17   protection laws.  Specifically, 7-Eleven argued that Curtis

18   did "not provide the Court with any analysis of the consumer

19   fraud laws of the nine states that fall within her class

20   definition, much less provide an explanation of how the

21   differences in these laws reasonably could be managed if this

22   case were to proceed on a class-wide basis."  I'm quoting

23   there Page 17 of 7-Eleven's brief at Docket No. 85.

24        7-Eleven did more, too.  It attached an 11-page chart

25   which surveyed the consumer protection laws.  The chart is

1    available at Docket No. 85-10.

2         According to 7-Eleven, key differences emerged

3    between the laws of the different states.  For example,

4    7-Eleven says that several of the state statutes do not have a

5    *scienter* requirement, but states like Illinois and Michigan

6    do.  Take a look at their brief at Page 17, Docket No. 58.

7         Next, 7-Eleven called out Curtis's silence about the

8    other two claims, specifically, the claim for breach of an

9    expressed warranty and the claim for unjust enrichment.

10        7-Eleven noted that Curtis did not "address the

11   common law of each of the nine states at issue or

12   comparatively analyze those laws to show that the laws are not

13   substantially similar and/or that the variances are

14   manageable."  Docket No. 85 at Page 17, Note 7.

15        Curtis replied, but the reply was not a winner.

16   Essentially Curtis argued that her burden wasn't very heavy

17   and that she didn't have much work to do on this part.  Take a

18   look at the plaintiff's reply, Pages 9 to 10, Docket No. 90.

19        In her eye, the effort was a waste of time, so she

20   didn't have much to do.  Curtis reasoned that other Courts

21   "have already undertaken that very analysis" and granted

22   certification in consumer cases involving the exact same

23   states.  That's what Curtis said on Page 10 of the brief at

24   Docket No. 90.

25        For example, they -- Curtis cited the *Benson* case,

1   221 WL 5321510 at Page 9, Northern District of Illinois 2021.

2   Curtis also cited the *Mednick* case, 320 F.3d 140 at Page 157,

3   Northern District of Illinois 2017.

4          At its core, Curtis's position is that she didn't

5   have to say much about the issue because different courts in

6   this district in cases involving different parties decided

7   this issue in the same way that she thinks it should go here.

8          Specifically, Curtis said that she "does not see the

9   need to re-create the very same chart . . . that was already

10  submitted in these cases."  I'm quoting there Page 10 of the

11  reply brief.

12         Curtis's argument here is misguided.  The analysis

13  from the other courts in this district could have given Curtis

14  ammunition to support her argument, but the district court

15  decisions did not absolve Curtis from her burden of making a

16  developed argument in the first place.  She needed to show

17  this Court that the "application of substantive laws from

18  multiple jurisdictions does not defeat predominance."  I'm

19  quoting there Volume 1 of *Newberg and Rubenstein on Class*

20  *Actions*, Section 4:61, 6th edition at 2024.

21         As the fourth circuit put it, "plaintiffs have the

22  burden of showing that common questions of law predominate,

23  and they cannot meet this burden when the various laws have

24  not been identified and compared."  See *Gariety v. Grant*

25  *Thornton, LLP*, 368 F.3d at 356, Fourth Circuit, 2024.

1       The Fifth Circuit recently said as much too.  In

2   *Elson v. Black*, 56 F.4th 1002, the Fifth Circuit 2023, the

3   Fifth Circuit addressed this point:  The Fifth Circuit

4   explained that "when different state laws govern different

5   Plaintiffs' claims," the district court is "required to

6   consider differences in state law when discerning whether a

7   class action is the appropriate vehicle."  That's Page 1007

8   from that decision.

9       There, the Fifth Circuit affirmed a district court's

10  decision to strike class allegations, where plaintiffs'

11  counsel, when asked, failed to submit a "list of the

12  requirements of the states in question."

13      Here's the bottom line:  A different decision by a

14  different circuit court in a different case involving

15  different parties does not erase the burden of Curtis here.

16  Those decisions might have helped Curtis carry her burden, but

17  they did not extinguish it.  It was plaintiff's burden to make

18  the demonstration in the opening brief that the other states

19  had similar laws and any differences between those states were

20  either insignificant or any differences would not overtake the

21  analysis from a predominate standpoint.

22      A reply brief isn't enough.  Relegating the argument

23  to a reply brief is a waiver.

24      In sum, Curtis had the burden to show that the

25  variety of state laws would not predominate over common

1    questions.  She didn't carry that burden, and from this

2    Court's class -- glance, the failure to make that showing is

3    telling.  The simple reality is that Curtis did not

4    demonstrate in her opening brief that common questions would

5    not be predominated by individual questions.

6            Curtis did not address the issue in any length in the

7    opening brief.  It was relegated to a reply brief.  That's not

8    enough.

9            Perhaps, more importantly than waiver is the fact

10   that it sure looks to the Court like there are significant

11   differences between those states.  And based on what the Court

12   sees, that's a problem.

13           I'm going to read a few things about what other

14   Courts have said in other cases.

15           "Defendants argue that Plaintiff's class allegations

16   are inadequately pled because conflicts among states' consumer

17   fraud statutes, and warranty and unjust enrichment law are too

18   varied for Rule 23 requirements to be established as a matter

19   of law.  Defendants do . . . cite to several opinions where

20   Courts have declined to certify national or multi-state

21   classes based on the same claims at issue here.  These

22   opinions highlight the uphill battle Plaintiff faces in

23   ultimately certifying these classes."  I'm quoting there

24   *Counts v. Arkk Foods Company*, 2023 WL 7281851 at Page 8,

25   Northern District of Illinois 2023.

1          Let me give you another quote.

2          "Courts routinely find material conflicts among the

3     fifty states' laws with respect to unjust enrichment claims."

4     See *Harris v. Rust-Oleum Corps.*, 2022 WL 952743 at Page 5,

5     Northern District of Illinois 2022.

6          Let me give you another quote.

7          "Defendant argues persuasively that applying the

8     warranty, unjust enrichment, and misrepresentation laws of

9     fifty different states, or even the five states that comprise

10    the multi-state class, is unmanageable on a class-wide basis

11    because those states' laws conflict in material ways."  See

12    *Cowen v. Lenny & Larry's, Incorporated*, 2017 WL 4572201, at

13    Page 4, Northern District of Illinois 2017.

14         Let me give you one more quote.

15         "The law of unjust enrichment varies too much from

16    state to state to be amenable to national or even multistate

17    class treatment."  See *In re Aqua Dots Product Liability*

18    *Litigation*, 270 F.3d 377 at Page 386, Northern District of

19    Illinois 2010.

20         At the end of the day, this Court has a

21    responsibility to conduct a rigorous analysis.  Indeed, in

22    *Pella Corp. v. Saltzman*, 606 F.3d 391, Seventh Circuit 2010.

23    The Seventh Circuit complimented a district court's "careful

24    consideration," which concluded that the consumer protection

25    acts of six states had quote "nearly identical" elements.

1    Maybe the analysis would have come out in Curtis's

2  favor, but Curtis did not put the ball in play here.  Curtis

3  did not give this Court the ammunition it needs to pin the

4  analysis down.

5    Curtis did not say a whole lot about the issue in her

6  opening brief.  And in her reply, she did not substantively

7  engage with 7-Eleven's arguments about the material

8  differences.

9    True, Curtis did attach a chart to her reply, which

10  this Court understands has been submitted in other cases.  The

11  chart is in the record at Docket 90-2.  But the effort is too

12  little, too late.  The Court needed more information up front

13  to conduct the rigorous analysis that this Court had an

14  obligation to perform.

15    I also have a number of questions, a number of doubts

16  in my mind.  7-Eleven effectively poked holes and raised

17  questions about the differences between the states.  I don't

18  find that Curtis answered those questions and resolved those

19  concerns.

20    Based on what I'm seeing, there's just too many

21  potential differences between the laws of the different

22  states.  I am concerned that individual state-specific

23  questions would predominate and also make the case

24  unmanageable.

25    In sum, Curtis did not carry her burden.  This Court

1    is not convinced that the class satisfies the Rule 23(b)(3)'s

2    predominance requirement in light of the disparity in state

3    laws.

4           So, that's the first reason for my decision, folks.

5    I find that plaintiff did not satisfy her burden of showing

6    predominance.  She did not satisfy her burden of showing

7    predominance because of the issue of the disparity in state

8    laws.

9           If you want to seek a multistate class where you're

10   going to be sweeping in the laws of multiple states, a

11   plaintiff is duty-bound to show that the inclusion of

12   different states and different state laws would not create

13   individual issues that would predominate over common

14   questions.  You bring more states and more laws and more

15   people into the case, you have to show that the addition of

16   those states and those laws would not overtake the common

17   questions.

18          I find that Curtis did not meet that burden here.

19   Curtis invoked the laws of multiple states without

20   demonstrating to me to my satisfaction that the laws are

21   either identical or would not otherwise pose challenges from a

22   predominate standpoint.

23          7-Eleven demonstrated differences between the state

24   laws.  Based on the disparities shown by 7-Eleven, based on

25   Curtis's failure to make the showing in the opening brief, and

1   based on the waiver, I find that Curtis did not satisfy the

2   requirement under Rule 23(b) for predominance when it comes to

3   the state laws.

4           That's the first reason for my decision.

5           I'm now going to turn to my second reason.  That

6   second reason is also about predominance.  It has to do with

7   the existence of an injury and the existence of proximate

8   causation.

9           Here it goes.

10          This court concludes that the proposed class fails

11  the predominance requirement of Rule 23(b)(3) for a second

12  independent reason.  That reason involves the existence of an

13  injury and approximate causation.

14          Here it goes.

15          "Predominance builds on commonality; whereas Rule

16  23(a)(2) requires the existence of a common question,

17  Rule 23(b)(3) requires the common questions to predominate

18  over the individual questions [*sic*]."  *Eddlemon v. Bradley*

19  *University*, 65 F.4th 335 at 338, Seventh Circuit 2023.

20          That inquiry "calls upon courts to give careful

21  scrutiny to the relation between common and individual

22  questions in a case."  65 F.4th at 339.

23          Let me put that in plain English.  It is not enough

24  to show that there are common questions.  To have a class

25  under Rule 23(b)(3), a plaintiff must show that the individual

1    questions would not be predominate over the common questions.

2    You have to show predominance, in other words.

3         In that vein, a predominance analysis "begins, of

4    course, with the elements of the underlying cause of action."

5    See *Erica P. John Fund v. Halliburton Co.*, 563 U.S. 804 at

6    809, 2011.

7         "To determine which issues are common, individual,

8    and predominant, the Court must circumscribe the claims and

9    break them down into their constituent elements."  See the

10   *Eddlemon* case, 65 F.4th at 339.

11        Scholars have recognized the difficulties of

12   establishing predominance in consumer fraud cases.

13        Let me read you a long quote from *Moore's Federal*

14   *Practice*.

15        "It is more difficult for plaintiffs to establish the

16   required predominance of common questions in consumer fraud

17   cases than it is in securities cases.  No presumptions of

18   reliance apply to consumer fraud cases.  The vast, complex,

19   and unpredictable consumer markets preclude extension of any

20   'fraud in the market' theory like that applicable to

21   securities fraud cases.  Thus, even when consumer fraud cases

22   are brought pursuant to some consumer protection statute or

23   even under the Racketeer Influenced and Corrupt Organizations

24   Act, meaning RICO, individual questions tend to predominate

25   over common questions.  Nonetheless, some courts have found

1    common questions to predominate over individual questions in

2    cases in which the representations or omissions are so uniform

3    and standardized, and resulting damages from the fraudulent

4    conduct are so uniform or standard, that consumers' reliance

5    on the fraudulent conduct is susceptible to generalized

6    proof."  I'm quoting there Volume 5 of *Moore's Federal*

7    *Practice*, Section 23.45, Section b -- excuse me --

8    Section (5)(b), Third Edition in 2024.

9            Let me boil down that block quote for you.

10           He was talking about different statutes.  The concept

11   is it can be difficult to establish predominance in a consumer

12   fraud case.  That's the idea.  That's the idea.  And that's

13   the extent to which I rely on it.

14           With that note in mind, that framework in mind, the

15   Court will start with the elements of the claims under the

16   Illinois Consumer Fraud and Deceptive Business Practices Act.

17   It's called ICFA.

18           The ICFA covers both deceptive practices and unfair

19   conduct.  See *Benson v. Fannie Mae Confections Brands*, 944

20   F.3d 639 at 646, Seventh Circuit 2019.

21           As this Court explained in its earlier ruling, only

22   the deceptive practice theory is in play.  Take a look at my

23   opinion from September 13th, 2022, at Page 24, Docket No. 24.

24           Curtis alleged that the conduct was deceptive but not

25   unfair.  Take a look at the amended complaint at Paragraph 58,

1    Docket No. 31.

2          There, plaintiff wrote:  "As a direct and proximate

3    result of Defendant's false and deceptive advertising . . ."

4          A deceptive practice -- well, let me back up.  So

5    that means plaintiff has a deceptive conduct claim, but not an

6    unfair conduct claim.

7          A deceptive practice claim under the ICFA has five

8    elements.  "(1) the defendant undertook a deceptive act or

9    practice; (2) the defendant intended that the plaintiff rely

10   on the deception; (3) the deception occurred in the course of

11   trade and commerce; (4) actual damage to the plaintiff

12   occurred; and (5) the damage complained of was proximately

13   caused by the deception."  See *Newman V. Metropolitan*

14   *Insurance Company*, 885 F.3d 992, at Page 1001, Seventh Circuit

15   2008.

16         Notice the fourth element:  a plaintiff must have

17   suffered actual damage.

18         And notice the fifth element.  The fifth element is

19   proximate causation.

20         "To prevail under ICFA, a plaintiff must demonstrate

21   that the defendant's conduct is the proximate cause of the

22   injury."  See *Siegel v. Shell Oil Company*, 612 F.3d at 932, at

23   Page 935, Seventh Circuit 2010.

24         Before I say anything else, I want to acknowledge

25   that reliance is not an element under the ICFA.  Let me say

1    that again.  Reliance is not an element under ICFA.

2            Even so, a plaintiff does have to prove the existence

3    of an injury and does have to prove proximate causation.  A

4    proximate causation requires a showing that the plaintiff was

5    deceived by the defendant.

6            Let me also say that plaintiff's theory of injury

7    does seem to bake in the concept of reliance.  That's what the

8    complaint says.

9            Plaintiff's theory is the defendant made false

10   statements and that the plaintiff suffered an injury because

11   they relied on the misrepresentations.

12           Let me just give you a couple examples.

13           Paragraph 34 of the complaint says this:

14   "Importantly, Defendant goes beyond just placing a small

15   recycling symbol on the back of its packaging.  Rather,

16   Defendant intends for consumers to rely on its recycling" --

17   excuse me.  Let me say that again -- "rather, Defendant

18   intends for consumers to rely on its recyclable claims by

19   placing it in bold font on the front of the packaging for

20   consumers to review and consider."

21           Plaintiff then goes on to say the following at

22   Paragraph 35:  "Indeed, Defendant's deceptive recycling claims

23   caused injury to reasonable consumers like Plaintiff and Class

24   Members who did rely on Defendant's claim that its 24/7 Life

25   plastic products were recyclable and would not have purchased

1    Defendant's products or would have paid less for them had they
2    known that these products were false."

3         So, it's a good illustration of how plaintiff uses
4    the concept of reliance and bakes it into the theory of an
5    injury and theory of proximate causation.  Plaintiff does so
6    in other spots of the complaint as well.  Take a look at
7    Paragraph 57.  "Plaintiff and other members of the Class and
8    Subclass reasonably relied on Defendant's misrepresentations
9    regarding the recyclability of its 24/7 Life plastic products
10   in choosing to purchase Defendant's products, and would not
11   have purchased the products that they bought or would have
12   paid materially less for them had defendant not made the false
13   and deceptive representations regarding their recyclability."

14        Again, the concept of reliance is baked into
15   plaintiff's theory of the case.  It's baked into the theory of
16   the injury and baked into the theory of proximate causation.

17        Plaintiff does so in other spots as well.  Let me
18   give you one other example.

19        Paragraph 67 says as follows:  "It is inequitable and
20   unjust for Defendant to retain the revenues obtained from
21   Plaintiff's and the other Class and Subclass members'
22   purchases of Defendant's 24/7 Life plastic products because
23   Defendant knowingly misrepresented that these products were
24   recyclable and Plaintiff and the other members of the Class
25   and Subclass would not have purchased Defendant's 24/7 Life

1   plastic products, or would have paid less for them, had

2   Defendant not made these representations."

3         So, the concept is this:  According to the

4   plaintiffs, 7-Eleven made representations.  The individual

5   class members relied on them.  They bought the products

6   thinking they're recyclable when in fact they weren't

7   recyclable, and suffered injuries as a result.  That's the

8   theory of injury.  That's the theory of proximate causation.

9         Let me just give you the punch line for my ruling on

10  this point.  Here's the bottom line:  In the case at hand,

11  individual questions would predominate over common questions.

12  Getting to the bottom of whether each individual consumer has

13  a claim would require an intensive consumer-by-consumer

14  inquiry.  That painstaking inquiry would require a detailed

15  exploration of lots and lots of individual plaintiff-specific

16  questions.

17        Here's the punch line:  The consumer-specific

18  questions would predominate over the class-specific questions.

19  Individual questions predominate over common questions.  And,

20  therefore, you cannot have a class under Rule 23(b)(3).

21        To bring a claim here, plaintiff would have to dive

22  deeply into the individualized questions.

23        Again, plaintiff is bringing a consumer fraud claim,

24  so the jury would need to decide whether each individual

25  plaintiff was defrauded by the labeling.  In other words, the

1    jury would need to decide whether the defendant deceived the

2    plaintiffs and the members of the plaintiff class, whether

3    that deception caused an injury.  So, we have to get into

4    whether there is an injury and whether there is proximate

5    causation.

6             That raises a lot of questions.  As a starting point,

7    we'd have to decide whether each individual class member

8    purchased the product at all and if so, when.  We'd have to

9    decide whether that person is potentially within the class.

10            That's the first hurdle.  Candidly, it goes to

11   ascertainability, not predominance.  But it's step one.  It's

12   the starting point.  It's the easy part.

13            Even if we can identify the purchasers of the cups

14   and the plates and all of the other products, lots of

15   potential questions emerge.  And this is where the individual

16   questions predominate over the common questions.

17            Let me give you some examples.  Let me give you some

18   examples of how the individual questions rise to the surface

19   and take over.

20            For starters, you'd have to ask whether the class

21   members even saw the labels.  Did the class members see the

22   alleged representations?  That is, did the class members see

23   the statements about recyclability?  Or did the class member

24   simply grab the plates and grab the cups and take it off the

25   shelves and walk up to the counter and pay for them and go on

1    their merry way?

2          It's hard to see how an individual class member could

3    have suffered an injury without seeing the representations.

4    And we don't know that without asking people.

5          Next, you'd have to ask if the class members not only

6    saw the label but read it.  It's not enough to see something.

7    You can see a lot of words on a package.  You've got to ask if

8    they read it.

9          If the class -- if each individual class member --

10   let me say that again.

11         It's not enough to say that a class member saw the

12   packaging.  If the individual class member saw the

13   representations, did they read them?  Did they read the

14   packaging?  If so, were the representations about

15   recyclability important to that particular customer?  If so,

16   how important were the representations about recyclability to

17   the individual consumer?  Did the consumer purchase the

18   product as opposed to some other product because of the claim

19   about recyclability?  Would the consumer have purchased this

20   product if the product wasn't recyclable?  Would the consumer

21   have paid less if the consumer had known that it was not

22   recyclable?  And if so, how much less?

23         In other words, did it matter to the consumer whether

24   it was recyclable?  Or was the consumer simply trying to get

25   one last thing before heading out and going to the barbecue?

1    It is an individual class member-specific question

2    whether the class member saw the packaging. It is an

3    individual class member-specific question whether the person

4    read the labeling. It is an individual question whether the

5    statements about recyclability were important to the consumer.

6    Maybe they didn't care. It's an individual question whether

7    the consumer would have bought the product anyway. It's an

8    individual question whether the consumer would have paid less

9    if they had known that it was not recyclable.

10   There are lots and lots of individual questions. It

11   gets into why each individual made each purchasing decision.

12   Why did you buy those cups on that day? Did recyclability

13   have anything to do with it? Did you read it? Did you

14   understand it? Did you care? Would you have bought it

15   anyway? Would you have paid less? How much less?

16   Those questions are important. Those questions are

17   essential. Those questions are individualized. Those

18   questions are not common.

19   And here, it's no small undertaking given the

20   potential size of the proposed class.

21   As far as this Court understands the record, 7-Eleven

22   sold more than 1 million units of the products over the

23   relevant time. I'm relying there on the Turnin declaration,

24   Page -- excuse me -- Paragraph 12 at Docket No. 79.

25   Here's the bottom line: Based on the record and

1   based on the nature of the claims, individual questions

2   predominate over common questions in this particular case.

3           "Absent proof as to why a particular plaintiff

4   purchased a particular product," a plaintiff cannot establish

5   that a defendant's conduct "caused" her to "make that

6   purchase."

7           And the word "caused" and the phrase "make that

8   purchase" were in quotes.

9           I'm quoting there the *Siegel* case, *Siegel v. Shell*

10  *Oil Company*, 612 F.3d 932, at 936, Seventh Circuit 2010.

11          So, whether 7-Eleven's allegedly deceptive

12  advertising caused each individual class member's purchase is

13  a "individualized question of fact."

14          Curtis addressed this point in her deposition.

15  Curtis seemed to implicitly acknowledge the existence of

16  individualized questions.  At deposition, she would ask

17  whether -- excuse me.  At deposition, Curtis was asked whether

18  some people might find it irrelevant whether a product was

19  recyclable or not.  Curtis responded:  "Correct.  I guess you

20  can say that."  Take a look at the Curtis deposition at

21  Page 53, Docket No. 85-5.

22          Curtis herself acknowledged that some people would

23  think it's irrelevant whether a product was recyclable.

24  That's a powerful point.  Some people care; some people don't.

25  It depends on the individual.  And if it depends on the

1    individual, you can't say across the board that everybody

2    suffered an injury.  You can't say that individual questions

3    are no big deal.  Individual questions are the ball game.

4    Common questions do not predominate when Curtis herself says

5    that some people think that the recyclability is irrelevant.

6         In fact, Curtis said that her lawsuit is "for the

7    people that do care about recycling."

8         She said that on Page 53 of her deposition.  She said

9    that the case is "not directly for the people who don't care

10   about recycling."  That's Page 52 of her deposition.

11        Again, Curtis herself testified that some people care

12   about recycling, some people don't care about recycling.  She

13   thinks her case is about people who do care about recycling.

14   But we can't know if people care about recycling or not

15   without asking them.  That's an individualized question,

16   person by person, plaintiff by plaintiff, class member by

17   class member.

18        You cannot have a class of all people who bought the

19   product because it necessarily would sweep in lots of people

20   who are not deceived because they don't care.  People who

21   don't care about recycling didn't suffer an injury.  And

22   Curtis herself says that plenty of people don't care about

23   recyclability.

24        Again, Curtis's class definition sweeps up everyone

25   who purchased a 7-Eleven product, meaning the products in

1    question about recyclability.

2          It reaches lots of people who showed up to a 7-Eleven

3    and did not care whatsoever about whether the product was

4    recyclable.  In that vein, when she testified, she said the

5    following.  She agreed that the reasons why she might "decide

6    to purchase a particular item may be, and, in fact, likely

7    would be different than the reasons why someone else decides

8    to purchase the same item."

9          Curtis responded "yep" to that question, unquote.

10         That summary of the deposition may not play as well

11   as the transcript itself.  Just take a look at Page 49 of her

12   deposition.  She acknowledged that the reasons she bought the

13   products might be different than somebody else bought the

14   products.  You can't say across the board that people bought

15   the products for recyclability, because some people care and

16   some people don't.

17         At the end of the day, common sense says that lots of

18   people shop at 7-Eleven for lots of reasons.  And people make

19   purchasing decisions at 7-Eleven for lots of reasons.

20         Some people buy products because recyclability

21   matters to them.  And some people buy products, and

22   recyclability means nothing to them.

23         Some people make purchases without regards to whether

24   the cups are recyclable and whether the plates are recyclable

25   and so forth.

1          Common sense makes sense here.  Common sense tells

2     you that many people go into 7-Eleven and buy things like big

3     red cups and paper plates because they've got to go to a

4     barbecue.

5          Some people don't go into 7-Eleven and buy big red

6     cups and paper plates because they're worried about mother

7     earth.

8          Here's another way of putting it:  If a consumer did

9     not see the labels or did not read the labels or did not care

10    about the labels or would have bought the products anyway,

11    then it's hard to see how the consumer suffered an injury, and

12    it's hard to see how there's proximate causation.  The Court

13    would have to answer those questions about the existence of

14    injury and the existence of proximate causation on an

15    individualized basis.  It's a person-by-person, class

16    member-by-class member question.  That's why individual

17    questions would predominate over common questions.

18         Indeed, at deposition, Curtis's expert, Dr. Ellis

19    Jones, seemingly acknowledged the point.  Dr. Jones was asked

20    how someone might differentiate consumers who make purchasing

21    decisions based on its eco impact as opposed to people who

22    don't.  Dr. Jones said, "You could ask them, of course."

23    That's the Jones deposition at Page 42, Docket No. 87-3 at

24    Page 26 of 59.

25         Let me read that quote again.

1          "You could ask them, of course."

2          Well, think about asking them.  Think about that.

3   Think about asking the individual class members.  It's a big

4   undertaking.

5          7-Eleven's expert, Dr. Robin Cantor, also

6   acknowledged the difficulties in pinning down what caused a

7   particular person to make a particular purchase in a situation

8   like this.  Dr. Cantor's report says that "literature suggests

9   that green advertising and positive environmental messages do

10  not have a significant effect on consumers' intention to

11  purchase green products."  See the Cantor report at

12  Paragraph 80.

13         In Dr. Cantor's view, factors "such as price,

14  quality, convenience, and brand familiarity" often "overshadow

15  environmental considerations and can be primary drivers in

16  purchasing decisions."

17         People buy products at convenience stores like

18  7-Eleven for lots and lots of different reasons.  People have

19  all sorts of views about the environment.  People have all

20  sorts of views about recycling.  People have all sorts of

21  views about the importance of recyclability.

22         Some people are deeply devoted to environmentalism.

23  Some people feel passionate about recycling.  Other people

24  couldn't careless about environmentalism.  Other people

25  couldn't care less about recycling.

1    Again, we're talking here about a purchase from a
2    convenient store.  As Dr. Report -- excuse me -- as
3    Dr. Cantor's report explained, "in today's fast-paced world,
4    consumers . . . demand efficiency and speed from their
5    shopping purchases and seek to purchase from convenience
6    stores due to their speed of transaction."  I'm quoting there
7    Paragraph 45 of the report, which is at Docket No. 85-4.
8        Dr. Cantor went on to say, "Consumers shop at
9    convenience stores for last-minute purchases or for items to
10   fulfill immediate needs."
11       Here's another way of putting it:  The individualized
12   inquiries would swamp the common inquiries.  Here's how one
13   leading treatise put the problem:  "Individual issues of
14   reliance and causation ordinarily will predominate unless
15   consumers had no potential basis on which to make a purchase
16   decision other than the allegedly misleading statements.  This
17   conclusion follows from the fact that in most context,
18   individuals choose consumer goods or services based on
19   disparate knowledge or varied beliefs and reasons."  I'm
20   quoting there Volume 1 of *McLaughlin on Class Actions* at
21   Section 5:54, 20th edition, 2023.
22       After looking at the case law, this Court can see a
23   number of cases that support this conclusion.
24       Let me just read you a couple quotes from a couple
25   different cases that I thought were helpful.

1          "Whether a given class member was deceived" by the

2   "labeling" and "whether she suffered damages as a result" can

3   "only be resolved on an individual basis."  See *Lipton v.*

4   *Chattem*, 289 F.3d 456 at 462, Northern District of Illinois

5   2013.

6          Let me give you another quote.

7          "Denial of class certification is appropriate where

8   individual issues of causation predominate an ICFA claim."

9   See *Williams v. Ford Motor Company*, 192 F.3d 580 at 585,

10   Northern District of Illinois 2000.

11          Let me give you another quote.

12          "Because the ICFA requires individualized proof of

13   proximate cause, the district court did not abuse its

14   discretion in finding that class issues did not predominate

15   and denying class certification or partial certification for

16   particular issues.  Such a determination follows rationally

17   from the need for individualized proof and is not an abuse of

18   discretion."  See *Clark v. Experian Information Solutions*, 256

19   F.App'x 818 at 823, Seventh Circuit 2007.

20          "If the circumstances surrounding each plaintiff's

21   alleged reliance on fraudulent representations differ, then

22   reliance is an issue that will have to be proven by each

23   plaintiff, and the proposed class fails Rule 23(b)(3)'s

24   predominance requirement."  See *Unger v. Amedisys, Inc.*, 411

25   F.3d 316 at 321, Fifth Circuit 2005.

1          Let me give you one more quote from one more case.

2          "Because proof often varies among individuals

3     concerning what representations were received, and the degree

4     to which individual persons relied on the representations,

5     fraud cases often are unsuitable for class treatment."  See *In*

6     *re Jude Medical*, 522 F.3d 836 at 838, Eight Circuit 2008.

7          Let me also read a statement from the advisory

8     committee of the federal rules.  This is the advisory

9     committee note discussing the 1966 amendment to subdivision

10    (b)(3).

11         The advisory committee said, "Although having some

12    common core, a fraud case may be unsuited for treatment as a

13    class action if there was material variation in the

14    representations made or in the kinds or degrees of reliance by

15    the persons to whom they were addressed."

16         So those are cases and that's a treatise that talks

17    about the difficulties of having predominance in a consumer

18    fraud context.

19         Let me be clear about one thing.  And this is

20    important.  This Court is not saying that a consumer fraud

21    case cannot give rise to a class action.

22         Let me say that again.

23         This Court is not saying that a consumer fraud case

24    cannot give rise to a class action.  Please don't hear it that

25    way.  I'm saying quite the opposite.

1    Sometimes a consumer fraud case can proceed as a

2    class.

3    Let me say that again.

4    Sometimes a consumer fraud case can proceed as a

5    class.  So, please do not overgeneralize and overread and

6    overhear what I've been saying.

7    The Seventh Circuit emphasized that consumer fraud

8    cases can give rise to class actions.  They said that in, for

9    example, the *Suchanek v. Sturm Foods* case, 764 F.3d at 750,

10   Seventh Circuit 2014.

11   The Seventh Circuit explained that "every consumer

12   fraud case involves individual elements of reliance and

13   causation."  I'm quoting there Page 759.  And "a rule

14   requiring a hundred percent commonality would eviscerate

15   consumer fraud class actions."

16   The Seventh Circuit emphasized that point in *Pella*

17   *Corp. v. Saltzman*, 606 F.3d 391, Seventh Circuit 2010.

18   The Seventh Circuit acknowledged that "a concern in

19   consumer fraud cases is the issue of proximate causation."

20   I'm quoting there Page 394, 606 F.3d at 394.

21   The Seventh Circuit continued:  "Proximate cause,

22   however, is necessarily an individual issue and the need for

23   individual proof alone does not necessarily preclude class

24   certification."

25   But as one Court in this district explained a few

1    years ago, the Seventh Circuit in "*Pella* did not hold that

2    individualized issues of proximate cause can never predominate

3    over common issues pertaining to common defect." I'm quoting

4    there *Smith-Brown v. ULTA Beauty*, 335 F.3d 521, 534, Northern

5    District of Illinois 2020.

6            I believe that was a Judge Dow case.

7            So, let me summarize it as follows.

8            It is true that a consumer fraud case can be a class

9    action. There is no per se rule against class actions in

10   consumer fraud cases. But it is equally true that a consumer

11   fraud case is not automatically entitled to proceed as a class

12   action. A consumer fraud case can fail the requirements of

13   Rule 23 just like any other case.

14          So, a consumer fraud case can be a class action that

15   satisfies the requirements, and a consumer fraud case can

16   flunk the requirements of class certification under Rule 23.

17          Class certification depends on the case. Class

18   certification depends on the context. Class certification

19   depends on the nature of the claims. Class certification

20   depends on the facts of the case. And class certification

21   depends on the record.

22          Some cases are well suited for classwide treatment,

23   as the Court discussed in *Rowe v. Bankers Life & Casualty*

24   *Company*, 2012 WL 1068754 at Page 10, Northern District of

25   Illinois 2012.

1        For example, sometimes there is a "commonsense

2  inference that no rational class member would purchase the

3  product had they known all the facts, regardless of their

4  individual circumstances."

5        Let me put it to you this way:  Sometimes a consumer

6  fraud case involves an alleged misrepresentation.  And

7  sometimes the alleged misrepresentation is about a feature of

8  the product that is deeply embedded in the nature and core of

9  the product.  Sometimes the misrepresentation is about the

10  essence of the product.

11        Let me give you some examples.

12        Let's imagine that there was a consumer fraud case

13  about tooth whitening strips.  And let's imagine if the seller

14  represented that the strips would whiten your teeth, and let's

15  imagine that the teeth whitening strips did not whiten your

16  teeth at all.

17        So, again, the hypothetical involves tooth whitening

18  strips that did not whiten anyone's teeth.

19        There would be a strong reason to think that people

20  who bought the teeth whitening strips wanted a product that

21  would whiten their teeth.  There would be a nexus between the

22  alleged misrepresentation and the core of the product, the

23  essence of the product.

24        The same goes for dental floss.  It would be

25  reasonable to think that a person who bought dental floss

1   wanted a product that would do some good work between the

2   teeth, that could withstand the pull and tug of cleaning out

3   the teeth.

4           Or let's imagine a consumer bought oat milk.  It's

5   probably important to the consumer that the oak milk be made

6   of oak.  Excuse me.  I said -- I botched that line.  I've got

7   to say that again.

8           It is probably important to the consumer that the oat

9   milk be made of oat.  If the oat milk was actually made of

10  barley, it would be reasonable to think that people would feel

11  duped.  After all, no one buys oat milk for the taste.  They

12  buy it because it's made of oats.

13          Let me give you one more example.

14          Imagine if consumers bought red cups at 7-Eleven that

15  couldn't hold liquid.  Or let's imagine if the consumers

16  bought cups that were unsafe to use because they contained

17  toxic chemicals.  Or let's imagine some other variation.

18          A consumer fraud case might make sense in those cases

19  if there is an alleged misrepresentation, for example, about

20  whether the cup could contain liquid.  The misrepresentation

21  there would be closer to the essential purpose of the product.

22  The misrepresentation would go to the central purpose and

23  defining characteristic of the product itself.

24          In other words, sometimes plaintiffs bring consumer

25  fraud claims where the challenge involves an attribute that is

1    inherent to or central to or essential to the nature of the

2    product that is purchased.

3         The closer the nexus between the nature of the

4    product and the alleged fraudulent attribute, the stronger the

5    inference that the consumers reasonably relied on it.

6         That's another way of saying that the injury

7    component might be easier, the proximate causation question

8    might be easier, but the more attenuated they are, the more

9    difficult it is to generalize.

10        The Ninth Circuit touched on this in a case called

11   the *Poulos* case, *Poulos v. Caesars World*, 379 F.3d 654, at

12   655.  It's a Ninth Circuit case in 2004.

13        The Ninth Circuit explained that "due to the unique

14   nature of gambling transactions and the allegations underlying

15   the class claims, this is not a case in which there is an

16   obvious link between the alleged misconduct and harm."

17        Notice that phrase, folks:  "obvious link."  "Obvious

18   link."  The Seventh -- excuse me -- the Ninth Circuit there

19   was talking about the connection between the misrepresentation

20   and the nature of the product.

21        How reasonable is it to think that there is a nexus

22   between the misrepresentation and the purchasing decision?

23   How reasonable is it to think that there is a connection

24   between the misrepresentation and an injury?  How reasonable

25   is it to think that there was proximate causation?  That's

1   what the Ninth Circuit was talking about.

2           Here, maybe some consumers bought red cups and paper

3   plates at 7-Eleven.  Maybe some consumers thought that

4   recyclability of those products was material to their

5   purchasing decisions.  In other words, maybe some consumers

6   bought red cups and paper plates at 7-Eleven, and they cared

7   about recyclability.  But that inference is not so strong.  It

8   can't be taken for granted.  The link between the nature of

9   the product and the type of representation is more attenuated.

10  It cannot be taken as a given that people who buy foam plates

11  and red cups at 7-Eleven care about recyclability.  That's why

12  it's an individualized question.  You have to ask people, why

13  did you do it?  Did it matter to you?  Did you even see it?

14  Did you care?  Do you care about recyclability?  Did it

15  matter?  Did it cause you to suffer an injury?  Would you have

16  bought the cups anyway?  Did you care about price when you

17  were running a barbecue?

18          I bet you there are a lot of people that are late for

19  barbecues and just grab 7-Eleven cups not caring how much they

20  cost, candidly.  I think there probably is a lot of price

21  insensitivity when you're grabbing foam cups at 7-Eleven right

22  before you go to the barbecue.

23          Even if people care about price, it's not clear that

24  recyclability factors in that process.

25          Here's what I'm trying to say:  We cannot take it as

1   a given that people cared about the recyclability of red paper

2   cups at 7-Eleven.  We cannot take it as a given that people

3   cared about the recyclability of the foam cups or the paper

4   plates or the plastic bags or anything else.

5         Those are questions, but they are not common

6   questions.  They are individual questions.  They're class

7   member-specific questions.  They're personal questions for

8   individual people.

9         In sum, "the commonsense approach to causation does

10  not apply here because there is more than one logical

11  explanation for the plaintiff's participation in the

12  transaction or conduct at issue."  See *Rowe*, 2012 WL 1068754

13  at Page 10.

14        That was a helpful quote, and I'm just going to

15  paraphrase it for you in my own words.

16        Commonsense says that there is more than one logical

17  explanation for why people buy paper plates and foam cups and

18  red cups and plastic bags at 7-Eleven.  Maybe they care about

19  recyclability; maybe they don't.  Maybe it mattered to them;

20  maybe it didn't.  There is no way to say unless you ask them.

21  And if you ask them, you get embroiled in an individualized

22  person-by-person, class member-by-class member process, and

23  individual questions will overtake the case, individual

24  questions will predominate over common questions.

25        Here's the bottom line:  We have people who bought

1    big red cups and paper plates and so on from 7-Eleven.  I'm

2    going to go on a limb and say that some of these people bought

3    red paper cups at 7-Eleven.  They had a barbecue to go to, and

4    recyclability didn't matter to them.  They were probably

5    thinking about enjoying planet earth but not the recyclability

6    of products on planet earth.

7         There are a lots of people out there that are just

8    buying cups and thinking about being outside and thinking

9    about bratwurst and thinking about enjoying a red beverage --

10   excuse me -- and enjoying a brewed beverage from a local

11   distillery in their red cup.  Maybe they cared about

12   recyclability; maybe they didn't.

13        Let me give you the bottom line one last time.

14        Individualized questions predominate over common

15   questions.  We cannot take it as a given that people cared

16   about recyclability even if they saw it and even if they read

17   it.  People buy red cups and paper plates and paper cups and

18   foam cups and plastic bags at 7-Eleven for all sorts of

19   reasons.  We cannot take it as a given that these people

20   suffered an injury.  We cannot take it as a given that these

21   people made a purchasing decision based on recyclability.  We

22   cannot take it as a given that the representation about

23   recyclability proximately caused anyone an injury.  That has

24   to be proven.  It has to be determined.  It has to be decided.

25   And we can't do that without getting the facts.  We have to

1    figure out why each individual class member made their

2    purchasing decisions, and that's an individualized

3    person-by-person, class member-by-class member inquiry.

4    That's why individual questions predominate over common

5    questions.

6           So, for that reason, I'm going to deny the motion for

7    class certification on predominance grounds for a second

8    independent reason.  The first reason had to do with the state

9    laws.  The second reason had to do with the injury requirement

10   and the proximate causation requirement.  They both fall under

11   the rooftop of predominance.

12          So, that takes care of the ICFA claim.

13          This Court isn't going to break down the elements of

14   the other claims.  I mean the breach of warranty claim and the

15   unjust enrichment claim.

16          Curtis' brief did not devote any pages to the

17   predominance requirement for the breach of warranty claim or

18   the unjust enrichment claim.  It just wasn't addressed.

19   Curtis' motion for certification focused only on the ICFA

20   claim.  Take a look at Pages 14 to 18 of the brief, Docket

21   No. 76.

22          In fact, Curtis only used the phrases "unjust

23   enrichment" and "breach of express warranty" twice in that

24   brief.  Each time, Curtis used the phrase in the context of

25   summarizing the claims in the complaint.

1        In the motion for class certification, Curtis did not

2   engage in any analysis about whether the claims were suitable

3   for class action treatment.

4        Indeed, 7-Eleven noted the silence in their response.

5   7-Eleven wrote:  "Plaintiff's class certification motion does

6   not mention, let alone address, how any of the class

7   certification requirements are satisfied with respect to

8   breach of warranty and unjust enrichment claims asserted in

9   the amended complaint . . . Plaintiff's complete failure to

10  address any of these factors is an independent reason why the

11  breach of warranty and unjust enrichment claims cannot proceed

12  on a class-wide basis."  I'm quoting there Page 13, Footnote 7

13  of Docket No. 85.  That's 7-Eleven's brief.  I agree with

14  everything that 7-Eleven just said.  Curtis's reply brief did

15  not attempt to defend the silence.  That's a double waiver.

16  I'm referring there to the reply, Docket No. 90.  So, Curtis

17  did not meet her burden on the other two counts as well.

18       For those reasons, the motion for class certification

19  is denied.

20       Let me address one last thing.  I want to address

21  standing.  The issue is not dispositive, but I did want to

22  mention it.

23       Usually courts talk about Article III standing at the

24  beginning of a ruling.  After all, a Court can't do anything

25  if it doesn't have subject matter jurisdiction.  But the Court

1    is going to talk about the issue here at the tail end of its

2    ruling because the underlying issue is not actually an

3    Article III standing issue.

4            7-Eleven's response brief argued that class

5    certification would be improper because "courts have concluded

6    that certification of a multi-state class turns on the

7    participation of at least one representative plaintiff from

8    each state."  I'm quoting there Page 18, Footnote 13 of

9    defendant's response, which is Docket No. 85.

10           A few courts have interpreted this argument as

11   implicating Article III standing.  As one treatise put it "the

12   named plaintiffs in a putative class action lack standing to

13   assert claims under the laws of states in which they do not

14   reside or in which suffered no injury."  I'm quoting there

15   Volume 1 of *McLaughlin on Class Actions*, Section 4:28, 20th

16   edition, year 2023.

17           At least one district court in this district has

18   seemed to join that view.  It explained that "Plaintiffs

19   cannot possess the same interest or suffer the same injury

20   shared by all members of the class they wish to represent

21   where plaintiffs . . . suffered no injury under those state's

22   laws."  I'm quoting there the *Brown* decision, 2022 WL 2442548

23   at Page 2, Northern District of Illinois 2022.

24           Lots of courts feel differently.  As a district court

25   in Michigan recently put it, "Whether a named plaintiff . . .

1   has Article III standing to assert claims arising under

2   different state laws on behalf of a nationwide class is a

3   difficult and complicated question that has sharply divided

4   courts in this district and across the country."

5         See *Fisher v. FCA US*, 2024 WL 186071, at Page 4,

6   Eastern District of Michigan 2024.

7         But a case law trend has seemingly emerged.  More

8   courts are coalescing around the idea that Article III

9   jurisdiction is not implicated.  For example, the Eleventh

10  Circuit a few years ago said that "all circuits which have

11  addressed whether a plaintiff can represent unnamed class

12  members whose claims fall under different state's laws have

13  concluded that it is a question that concerns Rule 12(b)(6) or

14  Rule 23, not Article III."  See *In re Zantac (Ranitidine)*

15  *Products Liability Litigation*, 2022 WL 16729170, at Page 6,

16  Eleventh Circuit 2022.

17        The Eleventh Circuit went on to say that "leading

18  class action treatise is of the same view."  They were citing

19  the first volume of *Newberg and Rubenstein on Class Actions*,

20  at Section 2:6, Fifth Edition 2021.

21        The Seventh Circuit seems to agree.  We don't have a

22  lot from the Seventh Circuit on this, but we have the *Morrison*

23  case.  In *Morrison v. YTB International*, 649 F.3d 533, at 536.

24  The Seventh Circuit issued its decision in 2011.

25        The Seventh Circuit talked about a multistate class.

1    The Court of Appeals wrote:  "If the Illinois Consumer Fraud

2    Act does not apply because events were centered outside

3    Illinois, then plaintiffs must rely on some other state

4    law" -- some other -- let me say that quote again.

5         The Court of Appeals wrote:  "If the Illinois

6    Consumer Fraud Act law does not apply because events were

7    centered outside Illinois, then plaintiffs must rely on some

8    other state's law; this application of choice-of-law

9    principles has nothing to do with standing, though it may

10   affect whether a class should be certified."

11        That's, again, just a snippet from the Seventh

12   Circuit, but I follow whatever they say to the best I can,

13   including snippets.  And that's the best direction I've been

14   able to find.

15        In sum, as one other Court put it, this Court

16   interprets 7-Eleven's argument as "a question best left for

17   class certification rather than a question for standing."  I'm

18   quoting there the *Garland* case, 2024 WL 1376353, at Note --

19   excuse me -- at Page 4, Northern District of Illinois 2024.

20        And that brings us back to where this Court started:

21   Predominance under Rule 23.  And like this Court already

22   explained, Curtis did not carry her burden to show that the

23   class certification requirements are satisfied.

24        So, I would conclude as follows.

25        I have announced a long ruling.  I believe we started

1    at 12:15, and someway, somehow it is now 2:00 o'clock.  I've

2    been in some sort of time portal up here.  That went quickly

3    on my end, anyway.

4         I do want to acknowledge that despite giving you a

5    ruling for the last hour and 45 minutes, I have not covered

6    every argument that the parties raised in their briefs.  For

7    example, 7-Eleven spent a page arguing that Curtis didn't

8    prove her individual claims on the merits -- or -- I'm sorry

9    -- that -- sorry.  Let me say that again.

10        7-Eleven spent a page arguing that Curtis could not

11   prove her individual claims on the merits.  Take a look at

12   defendant's brief at Page 12, Docket No. 85.

13        Curtis also spent time arguing that her expert,

14   Dr. Ellis Jones, offered a way to prove damages on a classwide

15   basis without the need for individual inquiries.  There is a

16   lot of questions about damages.  Take a look at Curtis's

17   brief, Docket No. 78.

18        7-Eleven also spent time about damages at Docket

19   No. 85.

20        Injury is different than proximate causation,

21   proximate damage -- excuse me.  Let me say at that again.

22        Injury is different than proximate causation.

23   Proximate causation is different than damage.  So, the parties

24   had a whole discussion about how to calculate the amount of

25   damages.  I don't really need to get into that given my

1     ruling.

2          7-Eleven also filed a motion to strike the testimony

3     of Dr. Jones and incorporate it by reference.  That's a motion

4     to strike the expert testimony of Dr. Jones and Dr. Carney,

5     Docket No. 86.  That motion is going to be denied as moot.

6          The Court acknowledges that "when an expert's report

7     or testimony is critical to class certification, as it is

8     here, a district court must conclusively rule on any challenge

9     to the expert's qualifications or submissions before" --

10     excuse me -- "prior to ruling on a class certification

11     motion."  See *American Honda Company v. Allen,* 600 F.3d 813 at

12     814 to 15, Seventh Circuit 2010.

13          So, the Seventh Circuit there basically said when an

14     expert decision is critical, you've got to rule on the expert

15     motion first before reaching class certification.  I don't

16     think the expert's opinion about the quantification of damages

17     is essential here.  I'm issuing my ruling today for different

18     reasons.

19          Let me, again, summarize what I've done and why I've

20     done it.

21          I'm denying the motion for class certification.  I'm

22     doing it as an exercise of my discretion after considering the

23     record as a whole, including all the submissions from all of

24     the parties.

25          I've decided that based on the record as a whole,

1    plaintiff has not satisfied the requirements of Rule 23.  I

2    conclude that the plaintiff has not carried her burden.  I

3    find in particular that plaintiff has not satisfied the burden

4    of showing predominance.  I made that decision for two

5    independent grounds.

6           First, plaintiff did not establish predominance when

7    it comes to the issue of multistate -- a multistate class and

8    individual laws.  We've got a proposed class here that

9    involves nine states.  Plaintiff did not carry her burden of

10   showing that common questions would be predominate over

11   individual questions.  It looks to me like it's the opposite.

12   Individual questions would predominate over common questions

13   because you've got a bunch of different states and there's

14   been no showing by plaintiff that predominance would be met.

15          Second, the Court concludes that Curtis did not

16   satisfy her burden when it comes to predominance, when it

17   comes to the existence of an injury, and when it comes to

18   proximate causation.

19          I've explained at length that it is an individual

20   person-by-person, class member-by-class member question about

21   whether a person saw the labels, read the labels, cared about

22   the labels.  Consumers buy products at 7-Eleven for a lot of

23   different reasons.  There is no way to determine the existence

24   of an injury.  There is no way to determine proximate

25   causation without getting into individual questions.

1      I conclude based on the record as a whole that

2  individual questions would predominate over common questions.

3      I am not saying that you cannot have a class action

4  in a consumer fraud case.  I am tying my ruling to the

5  particulars and the specifics of this individual case.

6      I am making my ruling based on the unique facts and

7  unique circumstances and unique claims of this particular

8  case.

9      If the allegations were different, if the claims were

10  different, if the facts were different, I might reach a

11  different outcome.  I'm just making my decision here based on

12  what I see.  And I see here claims that people came into

13  7-Eleven and bought foam cups and red cups and paper plates

14  that included a recyclability representation.

15      I cannot decide in this case whether consumer fraud

16  took place without getting deeply embedded in individualized

17  questions about what the consumers did and why they did what

18  they did.

19      Individual questions on this record would predominate

20  over common questions.  So, I find that predominance is not

21  satisfied.

22      So, the motion for class certification is denied.

23      So, folks, that is my ruling.  I don't know what is

24  the most sore, your ears, my court reporter's fingers, or my

25  throat.  It's probably a three-way tie.

1          I will say this:  I remember being in Judge Shadur's

2   courtroom and sitting and listening and learning, learning and

3   learning from Judge Shadur and listening to him go on at

4   length sometimes to my great benefit.

5          I benefited by listening to Judge Shadur, by the way.

6          I know it is hard to sit and listen.  I know it is

7   hard to sit and listen.

8          I have often said that after the second grade, no one

9   likes to be read to, especially lawyers.

10          So, I do want to offer my sincere thanks that you

11   folks were kind enough to sit there and just listen to my

12   ruling.

13          I really wish I could give you a written ruling,

14   folks.  I really do.  And I hope that's coming across.  I wish

15   I could do it.  I'm just doing the best I can with the

16   bandwidth I've got.  And I thought reading it today would be

17   quicker and a more expedient way to get you a ruling sooner

18   rather than later.  So, thank you for your professionalism and

19   understanding.  Okay?

20          Why don't you folks come on up here.  Why don't you

21   come up.

22          That's the ruling.

23          You folks have got a lot to digest.  If you'd like to

24   order the transcript, you can go on the website.  You can put

25   an order in.  You can get it right there.

1          Again, this is just a motion for class certification.

2    This is not a motion for the case as a whole.  The individual

3    plaintiff still has her claims.  So, I don't know what those

4    claims are worth or how you'd like to proceed.  But here's

5    what I think you should do -- here's what I think you should

6    do:  You should think about the claim that is left -- the

7    claims that are left.  You should talk to your clients.  You

8    should talk to each other.

9          I'm going to direct you folks to meet and confer.

10   I'm going to direct you to submit a status report two weeks

11   from tomorrow and let me know what plan and how you'd like to

12   proceed with the case.

13         If you'd like a settlement conference, you can

14   request one.  Let me know if you want to have a settlement

15   conference, and I would make a referral.

16         And if you don't want a settlement conference or you

17   have other suggestions, that's fine.  But if you don't want a

18   settlement conference and you want to plow forward, you've got

19   to make a plan about how we're going to get this across the

20   finish line.  It's a 2022 case.  We're going to dash to the

21   finish line here one way or the other.  Okay.  So, let's work

22   together cooperatively, come up with a plan, do a status

23   report by two weeks from Friday, and we'll take it from there.

24         Okay.  Any thoughts on that?

25         MR. BATTAGLIA:  That works for us, Your Honor.  Thank

1  you.

2          THE COURT:  Okay.  Anything?

3          MR. TURIN:  That works for us, Your Honor.

4          THE COURT:  All right.  So, thank you, folks, for

5  bearing with me today.  I'll look forward to getting your

6  status report.  Once I get your status report, we'll figure

7  out how to proceed, and we'll go from there.  Okay?

8          Thank you, folks.  We're adjourned.

9          MR. BATTAGLIA:  Thank you.

10          MR. TURIN:  Thank you, Your Honor.

11          THE CLERK:  All rise.

12      (Which were all the proceedings heard.)

13                  *  *  *  *  *  *

14                      CERTIFICATE

15      I certify that the foregoing is a correct transcript from

16  the record of proceedings in the above-entitled matter.

17

18  /s/ *Amy Kleynhans*              *8/12/2024*

19  Amy Kleynhans, CSR, RPR, CRR      Date
    Official Court Reporter

20

21

22

23

24

25